(Decided 24th June, 1886.)

DAVID M. HESS *vs.* WILLIAM E. MUIR, and others.

*Bedding of Oysters—Riparian rights—Act of 1862, ch. 129—*
*Improvements into Navigable waters—Non-resident—Limi-*
*tation as to Extent of Oyster lots—Privilege of Locating*
*Oyster beds—License—Power of State over License—Right*
*of Property in the Oysters deposited during the Continu-*
*ance of the License.*

The bedding of oysters is not "an improvement" within the contemplation of the Act of 1862, chap. 129, defining the riparian rights of owners of land bounding on the navigable waters of the State.

The improvements which, under section 38, of Article 54 of the Code, as enacted by the Act of 1862, ch. 129, a proprietor of land bounding on navigable waters is entitled to make into the same, and which, with the other accretions provided for, shall pass to the successive owners of the land to which they are attached as incident to their respective estates, are such structural improvements as are subservient to the land, and which, used in connection with the land, enhance its value, or enlarge its commercial or agricultural facilities, or other utility, to an extent the land alone would be incapable of, and in this way improve it,—such as wharves, piers and landings.

A non-resident of the State, whether he be sole or part owner of land in the State, is incapacitated from holding a lot for the planting of oysters.

The limitation to any one person, citizen of the State, of five acres of land under water for the purpose of bedding oysters, cannot be indirectly evaded, as by transfer from original locators, so as to aggregate in the same person more lots than is by the statute allowed to one person.

The privilege of locating oyster lots has no elements of a grant by patent, but is simply a license, revocable at the pleasure of the Legislature; it is merely a personal privilege to the recipient, neither inheritable nor assignable.

The oysters deposited by the holder of a license during its continuance, remain his personal property, with the right of selling or otherwise disposing of them; but the territory continues subject to the control of the State.

APPEAL from the Circuit Court for Somerset County, in Equity.

The case is stated in the opinion of the Court.

The cause was argued before ALVEY, C. J., STONE, MILLER, ROBINSON, RITCHIE, and BRYAN, J.

*John W. Crisfield,* for the appellant.

On the case made by the bill, the complainant, as riparian proprietor, has the exclusive right to all accretions

to his land from, and the right of making improvements into, the waters in front of his land, subject only to the public right of navigation, and his right cannot lawfully be interferred with or taken away without his consent.

The sovereign, whether king or people, is the original and paramount proprietor of all territory, whether dry or covered by water, as the representative of its subjects and for their use. 3 *Blk. Com.*, 488; *Martin vs. Waddell*, 16 *Peters Rep.*, 269.

Rivers or arms of the sea, distinguished by the ebb and flow of the tide, are either public or private rivers. (*Woolrych's Law of Waters*, 40.) This classification is important, as it defines the right of property in the shores, the adjacent waters and the soil thereunder. The soil and waters of a private river, *ad medium filum aquae*, belong to the proprietor of the adjacent land, as incident and appurtenant to his grant of the latter. *Hargrave's Law Tracts*, 5; *Bac. Abr. title "Prerogative," B; Brown vs. Kennedy*, 5 *H. & J.*, 205.

The waters and underlying soil of public rivers at common law, in general, are supposed never to have been granted, but still to remain in the sovereign, for the common benefit of fishing and navigation; but all the authorities concur that the riparian owner has certain rights therein, as incident to his estate, such for instance as access to, and the use of its, waters in common with others, and all additions to his land by alluvion, reliction of the water, and the like. But these rights were obscure, illy defined and difficult to determine. 2 *Black.*, 202; *Woolrych's Law of Waters*, 29, 34, 36, 78; *The King vs. Lord Yarborough*, 3 *Barn. & Cress.*, 91; *Giraud vs. Hughes*, 1 *G. & J.*, 263; *Brown vs. Kennedy*, 5 *H. & J.*, 206, 207; *Chapman vs. Hoskins*, 2 *Md. Ch. Dec.*, 494; *Blundell vs. Catterall*, 5 *Barn. & Ald.*, 268.

In this state of doubt and uncertainty, the Act of 1862, ch. 129, was passed, avowedly, to remove these doubts. Its

true construction is the principal question in this case. *Art.* 54, *secs.* 7, 8, 9 *of the Code; Revised Code, Art.* 16, *secs.* 38, 39, 40.

Being both remedial and declaratory, it is to be construed liberally. *Dwarris on Statutes,* 637, 688 *to* 779, *passim.* It has frequently been under consideration in this Court, but its meaning and full scope have never yet been declared. *Day vs. Day,* 22 *Md.,* 536; *Goodsell vs. Dawson,* 42 *Md.,* 348.

The Act uses the word "accretions," a non-technical phrase, which comprehends every increase of soil on the water side, however and wherever made, which disposes of all the common law technicalities respecting *alluvion, reliction, avulsion,* and the like; and it also uses the words, "improvements into the water," without description or limit as to time, quality or intent, except only they shall not interfere with navigation, and declares that the owner of the adjacent land shall be entitled to these accretions, "in like manner and to like extent as such right may or can be claimed on water not navigable;" and in the next section declares "such improvements and other accretions as above provided, shall pass to the successive owners of the land, as incident to their respective estates," and then tops it all off by declaring in the final section, "no patent hereafter issued out of the Land Office, shall impair or affect the rights of riparian proprietors, as explained and declared in the two sections next preceding." This puts the riparian right on public rivers on the same footing as similar rights on private rivers, with this difference only, that the former is limited by the points of non-interference with navigation, and the latter extends, *ad medium filum aquæ;* which we know is not only a right to the water, but the property in the soil underlying it. *Scratton vs. Brown,* 4 *Barn. & Cress.,* 485.

The rights of the riparian proprietor, as recognized by the Act of 1862, are stronger and more extensive than

those arising under the Act of 1745, ch. 9; yet these latter are declared to be forever the right and inheritance of the improvers, their heirs and assigns forever. *Casey vs. Inloes*, 1 *Gill*, 501; *Dugan vs. Mayor, &c. of Baltimore*, 5 *Gill & John.*, 357; *Goodsell vs. Lawson*, 42 *Md.*, 348; *Wilson vs. Inloes*, 11 *G. & J.*, 358–9; *Williams vs. Baker*, 41 *Md.*, 523.

The Court below erred in its construction of the Act of 1862, by supposing the improvements contemplated by it were "structural;" as "by filling in, or by some visible appliances, in, along or over the water;" and it reached this conclusion from the use of the word "attached," "thereby clearly indicating," says the Court, "actual, structural, mechanical attachment, the removal of which is its destruction." It is submitted that this is not the true reading of the Act. The word "attached" is there used in reference to the *land* which forms the shore of the river to which the accretions and improvements are attached. The words of the Act are: "Such improvements and accretions as above provided for, shall pass to the successive owner of land to which they are attached, as incident to their respective estates." The Act nowhere speaks of "improvements," in contradistinction to the soil covered by the water in and upon which they are to be made. "Accretions" and "improvements" are associated in the Act, and are to be understood in the same general sense. Both are used by way of metonymy, and signify the soil on which they are made; and that soil so signified is the thing which is attached to the land of the shore owner as incident to his estate.

Nor do the laws of the State, providing for the location of oyster lots, in any way affect the construction of this Act. These laws are not questioned when applied to grounds, the title of which is still in the State, and there are many such. All the grounds separated from the shore by water sufficiently deep for navigation, are not

affected by the Act of 1862, and on such grounds these oyster lot laws are binding, but when they are sought to be applied to lands to which the riparian right, as defined by the Act of 1862, applies, these oyster lot laws are inoperative and of no effect. The State cannot invade a vested right. *Dugan vs. Mayor, &c. of Baltimore,* 5 *G. & J.,* 367; *Goodsell vs. Lawson,* 42 *Md.,* 348.

But if the Court should think that the complainant is not entitled to the rights claimed for him as riparian proprietor, and the provisions of the oyster law, respecting the location of lots, apply to the *locus in quo,* then, it is contended, he is still entitled to the relief prayed, on the ground of John Rutter's locations, set forth in the bill, whose rights by regular conveyances have passed to the complainant. These locations by Rutter, then owner of the shore, were made by him in front of his own land, in conformity to the law as it then stood, and are dated in 1877. They were made under and according to the Act of 1874, ch. 181, sec. 23.

John Rutter's use of the name of others in making these locations, for the purpose of securing title to himself, was not a fraud upon the law. No law was violated, and no one was injured. By the express words of the statute, he might take up five acres, and he had a priority of claim on all the residue. No notice was required of him to exercise his right. "And any other citizen of the State," the law provides, "may locate five acres not already located, provided thirty days' notice in writing shall be given to the owner of the land bounding on said *water proposed to be located;*" that the owner may have priority of claim, and if he (the owner) shall fail to appropriate the water mentioned in the said notice, within thirty days after it is received, then it shall be open and free to any one under the provisions of this Act. The policy of the State, it clearly appears, is to have all grounds suitable for the purpose, appropriated to the

oyster culture, by the owner of the shore, if he will, but if on notice he will not, then by any other citizen of the State. John Rutter, in locating these lots in the name of his friends, all of whom were citizens of the State and competent to hold them, was doing nothing wrong. He was the owner of the shore and could waive notice. By these locations so made for them, he did waive the notice, and they took the same right and title they would have acquired by a location on notice to Rutter, and his failure to appropriate within the limited period.

Nor was the assignment a fraud on the law. These persons, by Rutter, had appropriated "five acres each, for the purpose of protecting, preserving, depositing, bedding or sowing of oysters." It is conceded that this is not a title to the land itself, but it is a right to use the water and the soil covered by it, for a definite purpose; it is not a grant of the land but of a privilege—a franchise— a property of a peculiar nature—which might be withdrawn by the State, but of which they could not otherwise be lawfully deprived without their consent. *Phipps vs. The State,* 22 *Md.*, 388; *Casey vs. Inloes,* 1 *Gill,* 501.

If this be the nature of their title, why may they not assign it, at least in equity? It is not a personal trust, not a license to the individual, but a *quasi* property, with all the attributes of any other property of a like nature, and may be sold, assigned or transferred, as other property, to any one competent to hold it.

But if this Court should hold that the complainant is not entitled to avail himself of Rutter's locations, and shall also hold that the Act of 1862, does not enlarge the rights of riparian proprietors, or does not apply to this case, then, it is contended, that the complainant still has, unimpaired, all his common law rights in the water of the adjacent river, and in the soil covered by it, and is entitled to have these protected, and to the relief he asks, at least to the extent of an injunction during the pendency of the suit.

Hess *vs.* Muir, *et al.*

The alleged appropriation and location of lots in front of the complainant's shore by the defendants, are illegal and void. The mode of making such locations is a mere and special proceeding, prescribed by the statute, and it must appear on their face that the requirements of the statute have been specially pursued, in order to give title, otherwise they are mere nullities. All these Acts require, as the preliminary step, notice to be given to the owner or occupant of the land bordering on said water, and if he shall fail to locate and appropriate the water mentioned in the said notice, within thirty days, then it shall be open and free to any one. No notice at all appears by these certificates to have been given, and no notice in fact was given. The water and land under it were, therefore, never *open* and *free* to any one, other than to the owner of the shore. Nor is the failure to give notice excused on the ground that the owner was a non-resident. It is not to be questioned, that a citizen of Pennsylvania may lawfully hold lands in this State, and if he can hold them at all, it cannot be denied that he is entitled to the same, and all the rights, immunities and privileges respecting his ownership, as fully as if he were a citizen of Maryland. He is not inhibited from locating and appropriating oyster lots in front of his adjoining shore, nor is he restricted to a single lot of five acres. These restrictions are confined to those who desire to locate lots in front of the land of others owning the shore. *Art.* 71, *sec.* 17 *of the Code; Revised Code, Art.* 13, *sec.* 22; *Act of* 1874, *ch.* 181, *sec.* 23; *Act of* 1878, *ch.* 618, *sec.* 24; *Act of* 1884, *ch.* 518.

If the complainant, on either of the grounds stated, is entitled to the property described, or any interest therein, the averments of the bill are, that he has been, and is now being disturbed, under color of law, by a great number of persons who are made defendants. The bill is of that class known as bills of the peace. It sets out a right

and a possession under it; a wrongful disturbance by a great number of persons under pretended instruments, which, though illegal and void, cloud the title and impair the value of complainant's property. It shows a case of continued and repeated wrong by a multitude, for which there is no adequate remedy at law. Its object is to have these illegal appropriations and locations vacated and set aside; to remove the cloud upon his title; to restrain the defendants from further interference, and to prevent a multiplicity of suits. These, severally, are grounds of relief which not only authorize but require a Court of equity to interfere.

The jurisdiction of a Court of equity, not to allow a title, connected with possession, otherwise clear, to be clouded by a claim which cannot be enforced either at law or in equity, cannot be questioned. *Polk vs. Rose,* 25 *Md.,* 153; *Polk vs. Pendleton,* 31 *Md.,* 124.

Equity will decree the cancellation of instruments, for fear such instruments may throw a cloud over the complainant's title or interest. *Story's Equity Juris., secs.* 694 *to* 703.

*Henry Page,* for the appellees.

RITCHIE, J., delivered the opinion of the Court.

The bill alleges, that under a mortgage sale of property of John Rutter, the complainant is owner of certain land bounding on the Monokin river and St. Peter's creek, navigable waters of the State, in which the tide ebbs and flows, and that by virtue of such ownership, he is exclusively entitled to use the soil of the waters in front of said land in making improvements and bedding oysters thereon. It further alleges, that by the same deed conveying him said land, there were also conveyed to him some thirty-four oyster lots in front of said land, to which Rutter had acquired title in 1875, by procuring

other parties to locate them in their own names, and then to transfer their certificates of survey to him. The bill charges that the defendants in 1885, and since severally located some thirty-one oyster lots, on the identical sites of the Rutter lots, and without notice to complainant, although proprietor of the contiguous land. The relief prayed is that complainant's title to the said land and his rights to improve into the said waters in front thereof be established, and that the surveys, locations and certificates of defendants to their oyster lots be vacated and annulled; and also that the defendants be severally restrained and enjoined from all interference with complainant in the enjoyment of his right to improve into the said waters in front of his land, &c.

The prayer for injunction having been submitted on the allegations of the bill before answer by defendants, was denied by the Circuit Court at that stage of the case, whereupon this appeal was taken.

The ground of complainant's claim to relief is two-fold. His first and principal contention is, that under the Act of 1862, chap. 129, defining the riparian rights of owners of land bounding on navigable waters, he is vested with the exclusive right to make improvements upon all the soil of the water in front of his land, subject only to the restriction of not interfering with navigation, and that the bedding of oysters thereon is an "improvement," within the contemplation of the Act of Assembly.

It is apparent, that if such be the true construction of the Act, the State has relinquished to the proprietors of land on navigable waters, the sole right of planting oysters along the entire water front of its navigable waters, and whether the right be actually exercised or not.

Such a construction is at variance with the subsequent legislation of the State, which has repeatedly assumed the right to admit all its citizens to the privilege of using the soil of its public waters, subject to a prior right on

notice to the riparian proprietor to locate an oyster lot if he shall elect within a prescribed period to do so.

To have bestowed upon the contiguous land owner an absolute right to hold this water territory subject to such a use, and without actually so availing of it, would have been to surrender to a comparatively few, a most valuable public right, and to impair the most essential means of promoting an important source of subsistence and wealth to large numbers of the State's inhabitants. The true intent of the Act of 1862, can be gratified, in our opinion, without such unfortunate consequences.

The Act of 1862, after reciting in its preamble, "whereas, doubts are entertained in regard to the extent of the rights of proprietors of land bounding on navigable waters, to accretions to said land, and to extend improvements into said waters; for the purpose of solving such doubts, therefore"—proceeds to add three sections to Article LIV of Vol. 1 of the Code, which are as follows:

"37. The proprietor of land bounding on any of the navigable waters of this State, is hereby declared to be entitled to all accretions to said land by the recession of said water, whether heretofore or hereafter formed or made by natural causes or otherwise, in like manner and to like extent as such right may or can be claimed by the proprietor of land bounding on water not navigable.

"38. The proprietor of land bounding on any of the navigable waters of this State, is hereby declared to be entitled to the exclusive right of making improvements into the waters in front of his said land; such improvements and other accretions as above provided for, shall pass to the successive owners of the land to which they are attached, as incident to their respective estates. But no improvement shall be so made as to interfere with the navigation of the stream of water into which the said improvement is made.

"39. No patent hereafter issued out of the Land Office shall impair or affect the rights of riparian proprietors, as

explained and declared in the two sections next preceding this section, and no patent shall hereafter issue for land covered by navigable waters."

The subject-matter of the right declared by the first of these sections to be in the riparian proprietor, is "all accretions to said land." It seems obvious the right does not attach until the accretions to the land are formed and become visible. Until new land is made or emerges, there can be no "accretion" to or increase of the land of which it shall constitute a part. The very term imports an addition of what possesses the characteristics of land.

So long then as the water covers the soil adjacent to the land, it is not within the contemplation of the Act, but remains under the control of the State, subject to the possibility of accretion being made or formed therefrom. Under this Act, the riparian owner of land on navigable water has the same right to accretions, whether imperceptibly or palpably formed, and the same right to create them as is enjoyed by an owner of land on a non-navigable stream. But the parallel is confined to the accretion itself, and no grant to the land owner on navigable waters is intended of the soil itself over which navigable water still flows. The benefit of possible accretions to the latter class of landholders, is preserved to them by the last section of the Act, directing that no patent shall hereafter issue for land covered by navigable waters. Whether the State could repeal this protection, is a question not now practically before us.

That the prohibition of granting a patent of land covered by navigable waters, is not inconsistent with a license to locate lots for the planting of oysters, has been decided in the case of *Phipps, et al. vs. The State*, 22 *Md.*, 388, where is explained the office of the prohibition and the legal effect of such a license. The Court say: "The sole purpose of the provision referred to in that Act—'that no patent should issue for land covered by navigable

waters'—was to restrict and limit the powers of the Land Commissioner and nothing more.  *   *   *   *   It abundantly appears from the nature of the privilege in dispute, as well as from the terms in which it was conferred, that no transfer of the State's title to lands covered by navigable waters, was contemplated.   Permission to use given areas covered by navigable water for a particular purpose, seems to be all that the Legislature intended, and we think the language of its assent to that use, should be construed not as a grant binding on the State, but as a conditional license, revocable at the pleasure of the Legislature."

The improvements, which under section 38, a proprietor of land bounding on navigable waters, is entitled to make into the same, and which with the other accretions provided for, shall pass to the successive owners of the land to which they are attached as incident to their respective estates, are plainly, we think, such structures as are subservient to the land, and which used in connection with the land, enhance its value or enlarge its commercial or agricultural facilities, or other utility, to an extent the land alone would be incapable of, and in this way "improve" it.   They are to be made "into" the water, a term inconsistent with entire separation from the land. Wharves, piers and landings are examples of such improvements.   Farming and commercial interests are promoted by the privilege, and to encourage the development of these was the main object of conferring it.   When such improvements are made they become incident to the estate, as not inherently identical in nature with land, but from being joined to it, and contributing to its uses and value legally identified with it, as a fixture or a right of way, or other appurtenance that passes with land.

The mere planting or depositing of oysters in the water implies no essential union or relation between the main land and the soil under the water contiguous; and therefore, does not effect an improvement of the former,

implied in something erected or constructed, attached to the shore, and, together with the land, furnishing conveniences and facilities that enlarge the advantages of the latter.

Until, therefore, "improvements" are made to the land in the sense we have described, the mere right to construct them, although still subsisting, is not incompatible with licensing of the soil covered by water for uses not subversive of such right or irreconcilable therewith, and which must yield to the paramount right of making improvements when actually exercised. Then, and to the extent actually occupied by the improvements, do the improvements and the ground they necessarily occupy, become "incident to the estate."

The principal ground, therefore, upon which the injunction was asked for, is not maintainable; and there is left for our consideration only the asserted invasion of complainant's rights by the defendants setting up their claims to oyster lots located by them, and which cover the same area occupied by the lots he claims to have acquired a valid title to through John Rutter.

By the Act of 1874, chap. 181, which repealed all former general legislation on the subject of oyster licenses as embodied in Article LXXI of the Code of Pub. Gen. Laws, and was enacted as a substitute for said Article, but five acres of the waters of the State were allowed to be located, and by any citizen of the State only, for the planting, &c., of oysters. This restriction was intended as the limit of the area of each individual's holding; the policy of the State being to make the distribution of the benefits of the privilege as wide-spread as possible, both for the promotion of oyster preservation and culture, and enhancing the comfort and means of subsistence and livelihood of its citizens. This express limitation as to quantity, cannot be indirectly evaded so as to aggregate in the same person more lots than any one person is in

terms allowed to hold.   John Rutter having no power to
hold, even if a resident of the State, more than a single
lot, his acquisition of a greater number through the in-
strumentality of others, was a fraud upon the law, and
he derived no valid title to those so acquired, and accord-
ingly no purchaser could take a valid title to them
through him.   The appellant is further incapacitated
from holding any oyster lot whatever, because of his non-
residence in the State, the license being expressly re-
stricted to citizens of the State.   The Act of 1884, chap.
518, which superseded the Act of 1874, and is the Act
under which defendants took up their lots, declares that
no non-resident of this State shall be entitled to locate a
lot, whether he be sole or part owner of any land in this
State, and also that any title or pretended title to more
than five acres, or otherwise contrary thereto, held or
claimed by any person, is hereby declared to be fraudu-
lent and void.   The Act of 1886, chap. 501, which in
turn repeals and takes the place of Article LXXI, con-
tains similar provisions.

The appellant having therefore no right to the lots
derived through Rutter, which he derived through other
parties, because both of the invalidity of Rutter's title
and his own non-residence, and having no standing to dis-
pute the claims of the defendants, the injunction was
properly refused, and his bill cannot be maintained.

It is perfectly manifest that as under the decision of
*Phipps vs. State,* above quoted, the privilege of locating
oyster lots has no elements of a grant by patent, but is
simply a license, revocable at the pleasure of the Legis-
lature, it is merely a personal privilege to the recipient,
and consequently neither inheritable nor assignable.   The
power of assignment has not been given, and obviously
if exercised, would tend to defeat the purpose of restrict-
ing the holding of any one person to five acres, and in-
crease the facilities of non-residents to get possession of

oyster lots, which is positively forbidden, and result in the aggregation of more lots than the prescribed number in the hands of the same person, thus favoring the absorption by a few of what was intended for the many, and exposing to monopoly what was designed for several or individual benefit.

The privilege being created simply by license is subject to be terminated by the State whenever it shall deem the public interest requires it. The security of the license is only in the fairness and sense of justice with which it may be assumed, the State will deal with its citizens.

The oysters that may have been deposited by the holder during the continuance of the license, remain, of course, his personal property, with the right of selling or otherwise disposing of them, but the territory continues subject to the control of the State.

> *Order affirmed,*
> *and bill dismissed.*

(Decided 24th June, 1886.)

ALVEY, C. J., delivered the following separate opinion:

This case presents for decision questions of more than ordinary importance, and while I fully concur with my brother Judges in affirming the order appealed from, and in dismissing the bill, I prefer to state the reasons for my opinion, with some reference to the authorities bearing upon the questions involved.

The bill is filed by an owner of land bordering on navigable tide water of this State, seeking an injunction against the defendants, who are charged with interfering with and obstructing the use and enjoyment of what are alleged to be the rights of the plaintiff, in the water in the immediate front of his land. It is conceded that the plaintiff is a non-resident of the State, and was such at the time of the alleged acquisition of the rights supposed

to be violated by the defendants. It is charged in the bill that the plaintiff is owner of land bordering on the shores of two navigable streams, in which the tide ebbs and flows, and that, as riparian owner, he is entitled to the *exclusive right* of making improvements into the water in front of his land, and that such exclusive right embraces the right of laying off oyster lots, and planting the same with oysters, in front of his land, for his own use and profit, to the exclusion of all other persons from such use of that locality. Or, if such be not his strict rights as riparian owner, according to the principles of the common law, and as those principles have been extended and defined by the Act of 1862, ch. 129, yet he alleges and contends that the former owner of the land acquired exclusive right to the thirty-four oyster lots mentioned and described in the bill, by a kind of preemption, secured to him by the Act of 1874, ch. 181, sec. 23, by reason and virtue of the fact that such lots were actually located by and for such owner; and the plaintiff, having become owner of the land, claims to hold all those lots as assignee of the former owner, to the exclusion of the right of the defendants, or any of them, to make any such locations of oyster lots in the water in front of his land, as will in any way interfere with the lots previously located. It is not alleged or pretended that the lots claimed by the plaintiff have ever been seeded with oysters, but it is claimed that it is the exclusive right of the plaintiff so to use them at his pleasure, and that his right in this respect has been interfered with and obstructed by the defendants.

1. With respect to the question of the extent and nature of the rights that can or could have been exercised by the plaintiff, or those under whom he claims, as riparian owner of the land bordering on tide water, I do not propose to add much to what has been said in the opinion of the Court. There is nothing in the terms of

the Act of 1862, ch. 129, that would seem to justify, by any fair construction, the contention of the plaintiff, whereby he asserts the right in the riparian owner to locate oyster lots, to an indefinite extent, in front of his land, to the preclusion of the right of all other persons to lay off oyster lots in such locality, as being in derogation of his proprietary rights. The mere right of *accretion* when formed, whether by the recession of the water, or by natural causes or otherwise, as provided in the Act of 1862, ch. 129, certainly does not embrace the right to stake off any number of oyster lots in front of his land, which may be, and, in this case are, entirely disconnected with the shore line of the stream. Nor does the exclusive right to make improvements *into the water* in front of his land, conferred by another section of the Act of 1862, embrace the right to locate, and appropriate to his own exclusive use, oyster lots in front of his land. The right given to improve out from the shore into the water, was designed, manifestly, to embrace only structural improvements, such as wharfs, piers, warehouses, or the filling out from the shore and reclaiming the land from the inundation of the water. Indeed, until this case, I am not aware that it has ever been supposed that this right of improving out into the water could be construed as conferring upon the land owner the exclusive privilege of appropriating and using the bed of the sea or river in front of his land, for purposes of seeding and cultivation of oysters; and to support such a claim as that now set up, the terms of the statute should be plain and unmistakable. It is very clear, I think, that the Legislature never intended, by anything in the Act of 1862, ch. 129, to disturb, or in any manner restrict, the common right of fishery, farther than the structural improvements, when made, might be an obstruction to the exercise of that common right.

2. It is contended, however, that notwithstanding the claim and pretension of the plaintiff may not be sustain-

able under the provisions of the Act of 1862, ch. 129, de-
fining the rights of riparian owners, yet his claim to
protection of rights acquired under the Act of 1874, ch.
181, sec. 23, is well founded.  This latter Act is one of a.
series of Acts that have been passed, from time to time,
within the last twenty years, for the protection of oysters,.
and the better regulation and encouragement of their
cultivation and increase in the waters of this State.   The
section of the Act upon which reliance is placed, provided
"that the owner or owners of any land bordering on any of
the navigable waters of this State, the lines of which
*extend into and are covered by said waters,* shall have the
exclusive privilege of using the same for protecting,
sowing, bedding or depositing oysters, or other shell-fish,
within the lines of their own land; and any owner or
owners of land lying and bordering upon any of the
waters of this State, shall have power to locate and ap-
propriate in any of the waters adjoining his, her or their
lands, five acres, for the purpose of protecting, preserving,
depositing, bedding or sowing oysters, or other shell-fish;.
and that any other citizen of the State shall have power
to locate and appropriate five acres, in any waters in said
State not located or appropriated; provided, thirty days
notice in writing shall be given the owner or occupant of
land bordering on said water proposed to be located, that
the owner or occupant *may have priority of claim,* and
if they shall fail to *locate or appropriate* the water men-
tioned in said notice within thirty days after receiving the
same, then it shall be open and free to any one under the
provisions of this section," &c.   The principal provisions
of this section of the Act of 1874, seem to have had their
origin in the Act of 1865, ch. 181, sec. 22, passed for
the purpose of regulating the taking of oysters in the
waters of this State.   By that Act, the rights and privi-
leges granted, of seeding and cultivating oysters, were, by
express term, confined to citizens of the State.   But that

express restriction appears to have been omitted in subsequent legislation upon the subject, though the provisions of section 22 of the Act of 1865, were substantially re-enacted with some modifications and enlargements. This appears from the Act of 1867, ch. 184, sec. 29, the Act of 1868, ch. 406, sec. 27, and the Act of 1870, ch. 364, sec. 27. It was also omitted in section 23 of the Act of 1874, ch. 181, except, possibly, the restriction may have been retained by implication; and it is under the provisions of this latter Act, as we have seen, that the plaintiff makes claim. The provisions of this Act of 1874, ch. 181, have been repealed and re-enacted, with material changes and modifications, by subsequent Acts, and especially in respect to the rights and privileges that were granted by the section 23. This will appear by reference to the Acts of 1880, ch. 198, 1884, ch. 518, sec. 24, and 1886, ch. 296, sec. 44. And this being so, it is a settled principle that the judgments and decrees of this Court, as well as those of the Courts below, must be in accordance with the law as it may exist at the time of the judgment or decree rendered, except in those cases, where rights have become vested under laws that have since been changed or repealed. *Day vs. Day*, 22 *Md.*, 530, 539; *Montague vs. State*, 54 *Md.*, 483; *Steamship Co. vs. Joliffe*, 2 *Wall.*, 450; *Memphis vs. United States*, 97 *U. S.*, 293. We must therefore look to the law as it now exists, as well as to the Act of 1874, ch. 181, in order to determine the rights and standing of the plaintiff in Court.

By section 24 of the Act of 1884, ch. 518, and section 44 of the Act of 1886, ch. 296, which are the corresponding sections in those Acts to section 23 of the Act of 1874, ch. 181, it is expressly provided that "any title or pretended title to more than five acres, or otherwise contrary to this section, held or claimed by any person, is hereby declared to be *fraudulent and void;* and provided, that no non-resident of this State shall be entitled to avail

himself of the provisions of this section, whether he be sole or part owner of any land in this State."

Whether it be competent to the Legislature to restrict or deny to a non-resident owner of land bordering on any of the tide waters of this State, and where the lines thereof extend into and are covered by the water, the exclusive right of using his land, so extending into the water, for the purpose of planting and cultivation of oysters therein, as would appear to be attempted by the Acts of 1884, and 1886, in the sections before referred to, certainly admits of great doubt, to say the least of it. But that is not the question presented by the bill in this case. Here the question is as to the nature and extent of the supposed rights or privileges acquired by the plaintiff, if any have been acquired by him, in the bed of navigable tidal streams, the title to which is conceded to be in the State. The right to the thirty-four oyster lots in question, to the preclusion of the defendants and all other persons, is claimed by the plaintiff, not as owner of the bed of the river, but, as we have seen, as assignee [of a party who located the lots by virtue of what is supposed to have been a kind of pre-emptive right, secured to him by the statute law of the State. If therefore such right, in the owner of the adjoining land to the river, to locate or have located, the thirty-four oyster lots in the bed of the river, and to assign the same, cannot be maintained, then, clearly, there is not the slightest ground for the pretension set forth in the bill in this case.

It is not open to question, that all the soil below high-water mark, within the limits of this State, where the tide ebbs and flows, that is the subject of exclusive propriety and ownership, belongs to the State, subject only to such lawful grants of such soil as may have been heretofore made. "But this soil is held by the State, not only subject to, but in some sense in trust for, the enjoyment of certain public rights, among which is the common

liberty of taking fish, as well shell-fish as floating fish." *Smith vs. State of Maryland,* 18 *How.,* 71, 75, and the cases there cited. The State holds the propriety of this soil for the conservation of the public rights of fishery thereon, and, representing the sovereign rights of the people, it may regulate the modes of the enjoyment of the common right, and may adopt such rules and regulations as may be deemed best for the protection of that right, and for the encouragement of the cultivation and improvement of the fish, oysters as well as all other fish, in the waters within its jurisdiction. This right of protection and regulation by the sovereign power of the State, is not only recognized by the common law, but is founded in principles of general jurisprudence having for their object the promotion of the common welfare of the people. Hence *Vattel,* in his treatise on the *Law of Nations,* (*b.* 1, *c.* 20, *sec.* 246,) lays it down as one of the settled principles of general jurisprudence and government, that the sovereign may make all needful laws to regulate the manner in which the common property may be used by the citizen.

He says: "He [the Sovereign] cannot, indeed, take away their right from those who have a share in that property; but the care he ought to take of the public repose, and of the common advantage of the citizens, gives him doubtless a right to establish laws tending to this end, and, consequently, to regulate the manner in which things possessed in common are to be enjoyed. This affair might give room for abuses, and excite disturbances, which it is important to the State to prevent, and against which the prince is obliged to take just measures. Thus, the sovereign may establish wise laws with respect to hunting and fishing,—forbid them in the seasons of propagation,— prohibit the use of certain nets, and of every destructive method, &c. But, as it is only in the character of the common father, governor, and guardian of his people, that the sovereign has a right to make those laws, he

ought never to lose sight of the ends which he is called upon to accomplish by enacting them; and if, upon those subjects, he makes any regulations with any other view than that of the public welfare, he abuses his power."

In the case of *Corfield vs. Coryell*, 4 *Wash. C. C. Rep.*, 371, an oyster law of the State of New Jersey was brought under examination, and, by the terms of the statute, the taking of oysters between certain periods of the year was prohibited; and no person, who was not, at the time, an actual inhabitant and resident of the State, was allowed to take oysters at any time, on board any vessel, &c. That statute was held to be valid, and the full and elaborate opinion of Mr. Justice WASHINGTON, delivered in that case, has received the fullest sanction and approval of the Supreme Court of the United States, upon more than one occasion. In the course of his opinion, the learned Judge said: "Where private rights, do not exist to the exclusion of the common right, that of fishing belongs to all the citizens or subjects of the State. It is the property of all; to be enjoyed by them in subordination to the laws which regulate its use. They may be considered as tenants in common of this property; and they are so exclusively entitled to the use of it, that it cannot be enjoyed by others without the tacit consent, or the express permission, of the sovereign who has the power to regulate its use."

And so in the case of *McCready vs. The State of Virginia*, 94 *U. S.*, 391, where the question of the power of the State over its fisheries was considered by the Supreme Court, the Chief Justice, in delivering the opinion of the Court, and in referring to the delegation of power and jurisdiction to the United States, over the navigable waters within the States, said: "There has been, however, no such grant of power over the fisheries. These remain under the exclusive control of the State, which has consequently the right, in its discretion, to appropriate

its tide waters and their beds to be used by its people as a common for taking and cultivating fish, so far as it may be done without obstructing navigation. Such an appropriation is in effect nothing more than a regulation of the use by the people of their common property. The right which the people of the State thus acquire comes not from their citizenship alone, but from their citizenship and property, combined. It is, in fact, a property right, and not a mere privilege or immunity of citizenship." And in the same case it was held, that the second section of the fourth Article of the Constitution of the United States, which declares that the citizens of each State shall be entitled to all privileges and immunities of citizens of the several States, does not vest the citizen of one State with any interest in the common property of the citizens of another State; and that, consequently, a law of the State of Virginia, by which it was provided, that if any person other than a citizen of the State, should take or plant oysters in the waters of the State, he should be subject to fine and forfeiture, was neither a regulation of commerce nor a violation of any privilege or immunity of interstate citizenship, and was therefore valid.

It was in virtue of this general power of the State to conserve, regulate and improve the fisheries of the State, and particularly the oyster fisheries, that the statutes, to which I have referred, were passed. These statutes, the better to promote the growth and to increase the supply of oysters in the waters of the State, provide that any of the citizens of the State may locate one lot, and only one, of five acres, in any unappropriated ground covered by the tide, and plant the same with oysters, and thereupon he is given the exclusive control thereof. This, however, is not a grant of an indefeasible right or estate in the lot thus authorised to be located, and planted with oysters. It is simply a conditional or qualified license or franchise, revocable at the will and

pleasure of the State. *Phipps vs. State*, 22 *Md.*, 380, 388. It is neither inheritable nor transferable, but is purely a personal privilege in the party locating the lot. *Munson .vs. Baldwin*, 7 *Conn. Rep.*, 168. This, however, is to be taken with this qualification, that if the party lawfully locating the lot, takes oysters from other localities, and plants them in his lot, those oysters, with their increase, become his absolute property, and he, or his personal representatives, or assignees, may take them from the lot, within any reasonable time after the license or franchise is revoked or ended, or after assignment made. *Ang. on Tide Waters*, 137, 138, 139; *Phipps vs. State*, 22 *Md.*, 388. But in this case, it is not claimed that any of the lots in question were ever seeded with oysters; and under the last statute upon the subject, which repealed all former statutes, therein referred to, the plaintiff, being a nonresident of the State, is wholly incompetent to hold, or to exercise the privilege of locating any oyster lot within the waters of this State, (not within the lines of his own land,) though he may own land bordering upon the shore line of such waters. It is clear, therefore, that the plaintiff has no foundation whatever for the claim to relief sought by him, and that his bill should be dismissed with costs.

(Filed 24th June, 1886.)