THOMAS S. HODSON

*vs.*

NOAH T. NELSON AND JAMES W. NELSON.

*Riparian rights: right to make improvements; navigable*
*waters. Landlord and tenant: possession.*
*Equity: pleading; cases on bill*
*and answer.*

When a case is submitted on bill and answer, the latter is to
be accepted as true, in regard to matters which are susceptible
of proof by legitimate evidence. p. 334

Section 48 of Article 54 of the Code of 1912, does not pro-
hibit the erection of structures on poles, such as "crab houses"
and floating ponds, not attached to the mainland, and not in
any way interfering with the riparian owner's right of exit and
entrance to his property, or with his rights of building improve-
ments such as wharves, piers, warehouses, etc., out from the
shore, as authorized by the Act of 1862, Chapter 129.

pp. 335, 337

Where the riparian owner desires to make the improvements
contemplated by the Act, those who have made such construc-
tion or improvements in the water must yield to his para-
mount right; but the Act of 1862 (Article 54, section 48) does
not authorize riparian owners to prohibit such use of the waters
or the soil beneath, before the riparian owner himself makes
the improvements authorized by the Act. p. 342

Although the riparian owner has the right to reclaim land
and make improvements into the water in front of his land, yet

until he does so, the title to the land under water is in the
State.                                                     pp. 337, 340

Under section 48, Article 54 of the Code, a riparian owner
only acquires what is actually occupied by the improvements
made by him out from the shore.                            pp. 337, 340

The possession of a tenant is in law the possession of the
landlord.                                                  p. 337

*Decided January 14th, 1914.*

Appeal from the Circuit Court for Somerset County.   In
Equity.   (STANFORD, J.)

The facts are stated in the opinion of the Court.

The cause was argued before BOYD, C. J., BRISCOE,
BURKE, THOMAS, PATTISON, URNER, STOCKBRIDGE and CON-
STABLE, JJ.

*William L. Rawls* and *William L. Marbury* (with whom
was *Thomas S. Hodson,* on the brief), for the appellant.

*Joshua W. Miles* (with whom was *George H. Meyers,* on
the brief), for the appellees.

BOYD, C. J., delivered the opinion of the Court.

The appellant filed a bill for an injunction against the
appellees to enjoin them "from interfering or intermeddling
in any way, directly or indirectly, with the riparian rights of
plaintiff, and especially and particularly from erecting, main-
taining, occupying or operating any wharf, shanty, pound,
or carrying on any crab or other business thereon or therein,
in Jenkins Creek between Jenkins Creek bridge and the

mouth of said creek, without the permission, authority and consent of the plaintiff."

The bill alleges, (1) that the plaintiff is the owner and in possession of all the land bordering on both sides of Jenkins Creek, from Jenkins Creek bridge to the mouth thereof; (2) that under the laws of Maryland and the provisions of the Code relating to riparian rights, the plaintiff is entitled to all accretions to said land, by the recession of said water, whether heretofore or hereafter formed, or made by natural causes or otherwise, and is entitled to the exclusive right of making improvements into the water in front of his land, provided that said improvements do not interfere with the navigation of the stream of water, into which said improvement is made; that all such accretions and improvements, however, whenever or by whomsoever, made, and when made, belong to him as an incident to his estate in the land on the shore and that other persons, without his consent cannot lawfully destroy or interfere with his rights; (3) "that along the shores aforesaid of said Jenkins Creek, on both sides thereof, and within the limits aforesaid on said creek, there have been erected and now stand without the authority and consent of the plaintiff and against his protest and warning, certain structures, consisting of piling driven permanently into the ground under the waters of said creek, having wharves supported thereon, above said waters, and on the said wharves houses or shanties for the purpose of carrying on the crab packing business therein, which said wharves and shanties are at or near the edge of the channel of said creek; while between the said wharves and shanties and the adjacent shore are erected and maintained large pens or 'pounds' formed by driving poles into the soil under the water and connecting them with rails and scantling, or a stockade entirely of poles, for the purpose of enclosing or impounding the 'crab floats' in which hard crabs are confined and kept until they shed and become 'soft crabs' as they are known to the trade. That each of said wharves, shanties and pounds stands in said creek, between the shore belonging to the plain-

tiff and the channel of said creek, in front thereof, but not reaching to said shore, and constitute improvements in front of plaintiff's said land, and, in them, the occupants of one or more of them have for several years before the bringing of this suit conducted a crab business in hard and soft crabs or one of them, and that there are many other available sites along said shores, similarly situated and suitable for crab packing, now unoccupied;" (4) that the defendants occupy and are maintaining one of the aforesaid improvements consisting of wharves, shanties and crab pounds and are carrying on the crab business, etc.

An order *nisi* was passed that an injunction be issued, unless cause to the contrary be shown by the time therein named. The defendants filed an answer, in which they stated: (1) That they are informed that the plaintiff had recently acquired title to the land bordering on both sides of Jenkins Creek, and they therefore admit that he is the owner and in possession of said land, the same being low and boggy marsh land of little value. (2) That they admit the matters and things set forth in the second paragraph of the bill. (3) "Answering the 3rd paragraph of plaintiff's said bill of complaint, these defendants say: That while they are the owners and occupants of only one crab house or 'shanty' on said Jenkins Creek, and the owners of certain 'crab pounds' or crab floats, contiguous thereto, they are aware of the fact and freely admit that there are a number of other crab houses or small shanties similar to the one owned by the defendants, standing out in the waters of the said creek, which have been used by their owners, for more conveniently pursuing their occupation as crabbers, for many years before the plaintiff by patent acquired title to the marsh lands bordering on both sides of said creek; but these defendants allege and charge that these crab houses and crab pounds or floats are not along the shores of said creek in the sense that they are attached to or alongside of the shores of said creek, but, on the contrary, they are distant from said shores, out in the navigable waters of said creek, and entirely separated from the land on

both sides thereof; that these crab houses are not wharves but simply fishermen's shanties, supported on poles, driven in the mud in the bed of the creek, in or near the channel thereof; that these crab houses, crab pounds and crab floats, so as aforesaid erected or maintained, do not constitute improvements of the plaintiff's land, in part or in whole, but are entirely separated therefrom and have no relation thereto. (4) Answering the 4th and 5th paragraphs of plaintiff's said bill these defendants admit that without the consent of the plaintiff they are occupying and doing business in one of the aforesaid crab houses and have occupied the same for a period of about eight years during the crabbing season of each year; that they also own certain crab pounds or floats contiguous to their said crab house and crab pounds (which) are situated between Jenkins Creek bridge and the mouth of said creek, in the channel of said creek, about one-hundred yards from the closest shore, and separated therefrom by navigable waters."

It was agreed that the cause be set down for hearing and submitted for final decree on the bill and answer. The important question in the case is whether the structures referred to in the bill and answer, and erected and located as therein admitted, were in violation of or an interference with such riparian rights as plaintiff is entitled to under sections 47 and 48 of Article 54 of the Code (1912). Inasmuch as the case was submitted on bill and answer the latter is to be accepted as true in regard to matters which are susceptible of proof by legitimate evidence. *Miller's Eq. Proc.* 711, 317-321. So far as there is any conflict between them we must be governed by the facts set out in the answer. The third paragraph of it above quoted will therefore show the real situation we are to deal with somewhat differently from that alleged in the bill, although for the most part the parties differ but little as to the facts.

The statute relied on was passed in 1862, being Chapter 129 of the laws of that year, and the sections were numbered 37, 38 and 39. They are now sections 47, 48 and 49 of

Article 54 of Code of 1912, and are as follows: "47. The proprietor of land bounding on any of the navigable waters of this State shall be entitled to all accretions to said land by the recession of said water, whether heretofore or hereafter formed or made by natural causes or otherwise, in like manner and to like extent as such right may or can be claimed by the proprietor of land bounding on water not navigable. 48. The proprietor of land bounding on any of the nagivable waters of this State shall be entitled to the exclusive right of making improvements into the waters in front of his said land; such improvements and other accretions as above provided for shall pass to the successive owners of the land to which they are attached, as incident to their respective estates. But no such improvement shall be so made as to interfere with the navigation of the stream of water into which the said improvement is made. 49. No patent hereafter issued out of the Land Office shall impair or affect the rights of riparian proprietors, as explained and declared in the two preceding sections; and no patent shall hereafter issue for land covered by navigable waters."

As section 47 relates to accretions and 48 to improvements the latter is the one with which we are specially concerned. Sometimes the distinction between the right to make improvements and the right of accretion is not kept in mind, as for example by the Circuit Court in its opinion in *Goodsell* v. *Lawson*, 42 Md. 364, which was referred to in *Linthicum* v. *Coan*, 64 Md. 453. The case of *Goodsell* v. *Lawson* is the authority mainly relied on by the appellant, but there are some marked differences between the facts in that case and those in this. In that case there was a solid structure built out of oyster shells in the water in front of the plaintiff's property. The record does not clearly show whether the pier built by Goodsell was connected with the shore, but however that may have been he had filled up part of the lot leased to him and it either was already or was to be connected with the main land. There ought not to have been the least hestitation to grant relief in that case, for the lessee after placing

the oyster shells in the water, under an agreement with the owner of the land, undertook to get a patent on the land so reclaimed. He would have materially obstructed the use of the water by the owners of the shore, under whom he went into possession, and the improvements were already in part made. We have seen above the character of structures in this case, which are described in the parts of the answer above quoted.

It might perhaps have been better to have described more accurately what are spoken of as crab houses and crab pounds or floats than is done in the bill or answer. The learned judge below concluded his opinion by saying: "Without dwelling further on the plaintiff's contention in this cause, it seems clear to us that the defendants' alleged structures and use thereof interfere in no way with the plaintiff's right to build a wharf, pier or warehouse out from the shore and into the water, or with his right of filling out from the shore and reclaiming his land from the inundation of the tide, nor does the plaintiff allege that it so interferes, or that he intends now or hereafter to so improve his land; it is no more an interference with such right than would a houseboat, with pounds attached, anchored out in the stream; and is no more such than would be an ordinary fish pound and net, attached as they generally are with stakes or poles driven into the soil under the water; it is in fact no such accretion or improvement as is contemplated by the statute or defined by the Court of Appeals as such."

If we either accept that as an accurate description of the structures or simply rely on the answer to get the description from, there can be no doubt that the facts in this case are wholly different from those in *Goodsell* v. *Lawson,* with which the Court was there dealing. There was not only not any question in that case about the improvements being of a permanent character, but they were erected by the defendant with the owner's consent, and with the distinct understanding that they should at the end of the ten-year term become their property. The appellant was actually in possession of the

premises, under and by virtue of the contract made between him and the owners, and the improvements had already been at least in part made. His possession of them as tenant was in law the possession of his landlord.

But in this case nothing whatever has been done by the appellant in the exercise of the right conferred on him by section 48 of Article 54 of the Code, and, so far as appears from the record, he has no intention or desire to make any improvements in the water in front of his land, for the present. Grant that an owner has such rights vested in him by that section as will entitle him to the protection of a Court of Equity against the erection of any improvements of such character as must interfere with him when he wants to make them, is he to have such control of the waters in front of his land as will enable him to prevent anyone from using them for purposes such as these appellees use them, even though he does not intend to use them himself? If he is, then all he has to do is just what the appellant has attempted to do, acquire the ownership of the shores of a creek where the crabbing or similar business has been carried on, and without making any improvements himself, notify those who have been engaged in the business to stop it or pay him rent. What was said in *Hess* v. *Muir* on page 596 of 65 Md., is very applicable: "To have bestowed upon the contiguous land owner an absolute right to hold this water territory subject to such a use, and without actually so availing of it, would have been to surrender to a comparatively few a most valuable right, and to impair the most essential means of promoting an important source of subsistance and wealth to large numbers of the State's inhabitants. The true intent of the Act of 1862 can be gratified, in our opinion, without such unfortunate consequences." While that was said of the oyster business, the crab business in some localities in this State is an important industry, and when the Act of 1906, Chapter 711, in reference to oyster culture, was passed, the Legislature was careful to provide for maps and charts of all bottoms of the tributaries of the Chesapeake Bay where grass

grows and it is profitable to scrape for soft shell or shedder crabs and to have such bottoms properly designated by permanent objects on the shore, as are provided for in reference to natural oyster beds, bars and rocks, "which said crabbing sections shall be exempt from leasing for oyster culture." Art. 72, sec. 98.

When the appellant demanded rent of the appellees, as is shown by the exhibit filed with his bill he did, what was the rent for? Is he the owner of the water or the land submerged by it? Undoubtedly not. We said in *Western Maryland T. R. Co.* v. *Balto. City,* 106 Md. 567: "That although the riparian owner has the right to reclaim the land and to make improvements into the water in front of his original land, yet until he does so, the title to the land under the water is in the State." In *Linthicum* v. *Coan, supra,* we referred to *Giraud's Lessee* v. *Hughes,* 1 G. & J. 249, and *Casey's Lessee* v. *Inloes,* 1 Gill, 430, where it had been decided "that the right to make improvements in navigable waters granted by the Act of 1745, Chapter 9, section 10, was a mere privilege of acquiring property by reclaiming it from the water, and that until the improvement was completed no title was acquired by the adjacent owner." As a consequence of that doctrine it was held in *Casey's Lessee* v. *Inloes,* that where a riparian proprietor had not made any improvements in front of his property, his right to make them was intercepted by a grant from the State of land covered by navigable water bounding his property. That was under the Act of 1745, Chapter 9, which gave riparian owners the right to make improvements, as did certain other statutes, prior to the Act of 1862. In *Western Maryland Tidewater Railroad Co.* v. *Baltimore,* 106 Md. 567, we said: "Under the Code, the proprietor is now protected, by prohibiting the issue of a patent, but until he does make the improvements he has no interest in the land under the water on which his land borders, excepting such as the Act of 1862 or some other statute, if any, may give him." There is no claim that there is a statute other than that of 1862 which could give the appel-

lant the right contended for by him, but in that case we had in mind such as the Act of 1745 and similar statutes which might have been applicable to Baltimore lots on navigable waters.

In *Hess* v. *Muir,* 65 Md. 586, the complainant claimed that he, as owner of certain land on Manokin River and St. Peter's Creek, was, under the Act of 1862, vested with the exclusive right to make improvements on all the soil of the water in front of his land, subject only to the restriction of not interfering with navigation, and that the bedding of oysters thereon was an "improvement" within the contemplation of that Act. The Court in discussing section 37 (now 47) of the Act of 1862, said: "So long then as the water covers the soil adjacent to the land, it is not within the contemplation of the Act, but remains under the control of the State, subject to the possibility of accretion being made or formed therefrom. * * * But the parallel is confined to the accretion itself, and no grant to the land owner on navigable waters is intended of the soil itself, over which navigable water still flows." Then in speaking of section 38 (now 48) it said that the improvements "are plainly, we think, such structures as are subservient to the land, and which used in connection with the land enhance its value or enlarge its commercial or agricultural facilities, or other utility, to an extent the land alone would be incapable of, and in this way 'improve' it. They are to be made *'into' the water, a term inconsistent with entire separation from the land* (Italics ours). Wharves, piers and landings are examples of such improvements. Farming and commercial interests are promoted by the privilege, and to encourage the development of these was the main object of conferring it. When such improvements are made they become incident to the estate, as not inherently identical in nature with land, but from being joined to it, and contributing to its uses and value legally identified with it, as a fixture or a right of way or other appurtenance that passes with land." Again it was said: "Until,

therefore, 'improvements' are made to the land in the sense we have described, the mere right to construct them, although still subsisting, is not incompatible with licensing of the soil covered by water for uses not subversive of such right or irreconcilable therewith, and which must yield to the paramount right of making improvements when actually exercised. Then, and to the extent actually occupied by the improvements, do the improvements and the ground they necessarily occupy become 'incident to the estate.' "

What we have thus quoted at length from that case shows first, the character and object of improvements contemplated by the statute; second, that it is only when they are made that they become incident to the estate; third, that until they are made, the mere right to construct them, does not prevent such uses of the soil covered by the water as are not subversive of such right or irreconcilable therewith; fourth, when the right is exercised, such previous uses must yield to the paramount right of making the improvements, and, fifth, that the improvements and ground they necessarily occupy only become "incident to the estate" to the extent they actually occupy the soil and the water over it. This Court decided that that Act did not give the owner of the land the exclusive right to plant oysters. The opinion of the Court and CHIEF JUDGE ALVEY's concurring opinion emphasize the fact that the oyster lots were entirely disconnected with the shore line of the stream. JUDGE ALVEY said of section 48 : "Nor does the exclusive right to make improvements into the water in front of his land, conferred by another section of the Act of 1862, embrace the right to locate and appropriate to his own exclusive use oyster lots in front of his land. The right given to improve *out from the shore into the water* was designed, manifestly, to embrace only structural improvements, such as wharves, piers, warehouses, *or the filling out from the shore* and reclaiming the land from the inundation of the water."

The statement in *Goodsell* v. *Lawson,* on page 373 of 42 Md., "Again in making the improvements, the proprietor is

not compelled, as has been argued, to commence them at the shore, but may begin at the outer extremity of the projected improvement and extend the same to the bank of the river, which it clearly appears was the design in the present case" can not be said to mean that the improvements contemplated by section 48 must not be connected with the shore, as the other cases hold. On the contrary, that statement plainly recognizes the necessity of extending the improvements *to the bank of the river.* Of course, it could make no difference in law whether the improvements were commenced at one end or the other, and in a case like *Goodsell* v. *Lawson,* where the oyster business was conducted in the water in front of the property, and he was to distribute the shells in the water, perhaps the easiest and most natural way was to begin out from the land and fill in towards it.

We are then unable to agree with the attorneys for the appellant that *Goodsell* v. *Lawson* settles this case in his favor or that *Hess* v. *Muir* and others mentioned are not in conflict with the appellant's position. We, of course, do not doubt that the right secured to the appellant "is a valuable right which other persons can not lawfully destroy or interfere with," or that he would be entitled to relief if such circumstances were shown as those in *Goodsell* v. *Lawson,* where the improvements made were permanent in their character and such as would unquestionably interfere with the exercise of the appellant's right to make improvements, if he determined to make them for himself, even if we left out of consideration the contract and other relations which existed between the parties to that decision. But we do not find anything in this record, not met by the answer, which would entitle the appellant to enjoin the appellees. In addition to the authorities we have cited, it seems to us that the conclusion we have reached is sustained by reason and the well-known policy of this State in reference to the use of its navigable waters for oystering, fishing, crabbing, etc.

Whenever the appellant or the then owner of the land wants to make the improvements, the appellees and others similarly situated must yield to his paramount right, but to prohibit the use of the water, and the soil under it, as the appellees are using it, before the appellant makes his improvements would enlarge the rights of riparian owners beyond what the Act of 1862 authorized or contemplated. In some streams it would be liable to cause constant confusion and possible strife if the appellant's position was correct. In this instance the appellant happens to own on both sides of the creek, but suppose another person owned one side, how far could appellant control the stream? It is no answer to say that his right is only limited by the provision "so as not to interfere with the navigation of the stream," for, in the first place, that is not all of that limitation, as it is "so as not to interfere with the navigation of the stream of water into which *the said improvement is made*"—showing that the Legislature only thought it necessary to provide for a limitation after the improvements were made, as until then the riparian owner had nothing but the mere right to make them. As we have seen from the quotation from *Hess* v. *Muir,* the reparian owner then only acquires what is actually occupied by the improvements.

But in addition to that, in such a case as we have suggested, where would appellant's control cease and that of the owner of the opposite shore begin? If, for example the appellees were the owners of the opposite shore or had obtained the right to use the waters and soil as they now do from such owner, how could the appellant interfere? Where would he draw the line? It must be remembered that his right to improve is not limited by the thread or middle of the river, as that doctrine does not apply to this Act, as was expressly decided in *Goodsell* v. *Lawson.* The answer must be and is that when he does exercise his right to improve, his rights only extend to the soil and waters the improvements occupy. The appellant argued that if the appellees can erect such

structures 100 yards from the shore, they can erect them a foot from the shore, and entirely cut him off, but on the other hand it may be asked if the appellant can prevent such use of navigable waters as the appellees are making of this creek, one hundred yards from the nearest shore, how far out could an owner on a wide creek or river prohibit such acts as those now done by the appellees? No one can so use the navigable waters in front of the riparian owner's property as to interfere with his rights, and when the owner wants to make improvements he can do so, even if they absolutely destroy any structure or other thing in the way of the improvements not there by the consent of the owner of the shore, or someone who has acquired his rights or those superior to his. In case owners of opposite shores want to improve narrow streams some rules will have to be adopted for their mutual protection, as well as the protection of the public in so far as necessary to prevent them interfering with the navigation of the stream.

As the answer expressly denies that the defendants have ignored or disregarded any of the plaintiff's rights or that they are appropriating or using any of his property or obstructing or interfering with any of the property or property rights of the plaintiff in any way, it is not necessary to discuss the allegation in the bill that the defendants are obstructing his free ingress to and egress from his land. Being of the opinion that the plaintiff has not shown that he is entitled to the relief sought, we will affirm the decree refusing the injunction and dismissing the bill.

*Decree affirmed, the appellant to pay the costs.*