## THE WESTERN MARYLAND TIDEWATER RAIL- ROAD COMPANY *vs.* THE MAYOR AND CITY COUNCIL OF BALTIMORE.

*Statutory Boundary of Baltimore City on Patapsco River is Extended*
*by Construction of Piers into the River—Taxation of Piers.*

When the boundary of a municipality is described as binding on a stream of water, the rights of the municipality are to be determined by the same rules of construction as apply to the grant of land to an individual binding on water. And when an individual has a right to extend his land by filling in and making improvements into the water and does so, the boundary of the municipality is extended in the same way.

The southern boundary of Baltimore City remains as fixed by the Act of 1816, ch. 209, by which it was described as running with and bounding on the main branch of the Patapsco River, which is a navigable stream. Under the Acts of 1862, ch. 129 and other statutes, the owners of land binding on the water in said city have the exclusive right to make improvements into the water in front of their land, by the construction of wharves, piers or by filling out from the shore, and such improvements belong to the owners of the land as incident to their estates. A railroad company, which owned lots in said city bounding on said main

branch, constructed two piers extending out into the water from the bulkhead line for a considerable disfance.   The piers rest on piles and the river flows under them.   The shore line of the river as it existed in 1816, is a considerable distanc landwards from the present bulkhead line. *Held*, that the boundary of the city is not limited to the shore line or to the bulkhead line but is co-incident with the improvements and wharves extended into the water by individual owners, and that those portions of the piers which extend beyond the bulkhead line are subject to taxation by the city, and are not within the jurisdiction of Baltimore County, which adjoins the city on the south.

*Decided November 13th, 1907.*

Appeal from the Baltimore City Court (STOCKBRIDGE, J.)

The case was argued before BOYD, SCHMUCKER, BURKE and ROGERS, JJ.

*Leon E. Greenbaum*, for the appellant.

*Osborne I. Yellott*, for the County Commissioners of Baltimore County.

*Joseph S. Goldsmith* and *Albert C. Ritchie*, Assistant City Solicitors (with whom was *W. Cabell Bruce*, City Solicitor, on the brief), for the appellee.

BOYD, C. J., delivered the opinion of the Court.

The appellant owns several lots of ground in the city of Baltimore, which bound on the north side of the main branch of the Patapsco river, together with the riparian rights appurtenant thereto.   It constructed what are spoken of in the record as a freight pier and a coal pier.   The former is about 840 feet long and 120 feet wide and consists of a wooden platform resting upon piles, with a steel shed, one story high for freight purposes.   The latter is 729 feet on one side and 700 on the other, and is a wooden structure which also rests upon piles.   They were projected from the bulkhead line into the water to the pierhead line, and the water flows under them.   The Patapsco is a navigable river at the place in controversy, in which the tide ebbs and flows.   The eastern and

southern boundaries of the city are those fixed by the Act of 1816, ch. 209.  After describing the northern and eastern boundaries the Act describes the southern boundary as follows: "on the south by a line drawn from the Patapsco river, at the termination of the last mentioned line" (which is the last one on the east), "to the most southern part of Whetstone Point, on the main branch of the Patapsco river, and *running with and bounding on the said main branch,* excluding the land ceded to the United States on Whetstone Point, for the uses of a fort, to the place called the Ferry Point, being the junction of the said main branch with the middle branch aforesaid," etc.   These piers project from the boundary of the city which is included in the description *"running with and bounding on the said main branch,"* and it is conceded that they are for the most part constructed in a portion of the river, which was originally outside of and beyond the limits of the city.   The evidence tends to show that including the boiler-room, engine, machinery, etc., the cost connected with the coal pier within the bulkhead line was about $35,000 and the whole cost of the two piers was about $400,000.   The petition for appeal of the appellant states that it is properly assessable for $35,000 in the city, but that the rest is illegal and void because the property on which the assessment is made is not within the city, or within the assessing powers of the Appeal Tax Court. The contention of the appellee is that inasmuch as the piers are attached to and project from the land of the appellant, which borders on this navigable river, and are immovable structures, permanent in their character, they are taxable by the city of Baltimore.

It is well settled that the same rules of construction will be applied to the boundaries of a municipality, bordering on navigable or non-navigable water, as will be to a description in a grant to an individual for land so situated.   *Fort Smith & VanBuren Bridge Co.* v. *Hawkins,* 54 Ark. 509; s. c. 12 L. R. A. 487; *Perkins* v. *Oxford,* 66 Me. 545; *State, etc.,* v. *Columbia,* 27 S. C. 137, and a number of cases cited in the notes on page 1149 of 20 *Am. & Eng. Ency. of Law.*   In *Giraud*

564   WEST. MD. T. R. CO. vs. BALTIMORE CITY.

Opinion of the Court.                    [106

v. *Hughes*, 1 G. & J. 249, our predecessors thus stated the rule as to the rights of proprietors of land on navigable waters; "The principle seems to be well settled, that where a tract of land lies adjacent or contiguous to a navigable river or water, any increase of soil formed by the waters gradually or imperceptibly receding, or any gain by alluvion in the same manner, shall, as a compensation for what it may lose in other respects, belong to the proprietor of the adjacent or contiguous land." In this State where we have so much navigable water, many cases have been before the Courts involving the rights of riparian owners, and as at common law those rights were limited in some important respects statutes were very early passed concerning them.   The Act of 1729, ch. 10, creating Baltimore Town, shows that the General Assembly then had in mind the importance of establishing a town on the Patapsco river, and sec. 10 of the Act of 1745, ch. 69, whereby Baltimore Town and Jones' Town were consolidated, under the name of Baltimore Town, provided that "All improvements, of what kind soever, either wharves, houses or other buildings, that have or shall be made out of the water, or where it usually flows, shall (as an encouragement to such improvers) be forever deemed the right, title and inheritance of such improvers, their heirs and assigns forever."   Then the Act of 1796, ch. 68, gave the city powers to provide for the preservation of the navigation of the basin and Patapsco river, within the limits of the city of Baltimore, and four miles thereof," and declared that the powers granted to it should extend to Deep Point "and to all wharves and other grounds heretofore made and extended into the basin of Baltimore Town, or which shall hereafter be made or extended into the same, which shall be considered and taken as part of the said city; and the said corporation may provide for the exercise of such powers in the same manner as if the said wharfs and reclaimed lands were originally condemned as part of the said town."   Other Acts were passed and there is now in sec. 6 of the charter of the city full power and authority, "To provide for the preservation of the navigation of the Patapsco river and

tributaries, including the establishment of lines outside the limits of said city and within four miles thereof, beyond which no pier, bulkhead or wharf may be built or extended," and other powers and authority over the Patapsco river and branches thereof are given to the city authorities.   These and other provisions made by the statutes of this State tend to show that the Legislature never intended that the city of Baltimore should be deprived of the water front, which is so valuable to it, by limiting it to the shore line as it existed in 1816.   A plat filed with the record shows that that line is a considerable distance from the present bulkhead line, near the property now before us.

The Legislature in 1862 passed an Act which is embraced in secs. 47, 48 and 49 of Art. 54 of the Code, by which it greatly enlarged and defined the rights of proprietors of lands bordering on any of the navigable waters of this State.   Sec. 47 enacted that such a proprietor "shall be entitled to all accretions to said land by the recession of said water, whether heretofore or hereafter formed or made by natural causes or otherwise, in like manner and to like extent as such right may or can be claimed by the proprietor of land binding on water not navigable," and sec. 48 provided that such proprietor "shall be entitled to the exclusive right of making improvements into the waters in front of his said land; such improvements and other accretions as above provided for shall pass to the successive owners of the land to which they are attached, as incident to their respective estates.   But no such improvement shall be so made as to interfere with the navigation of the stream of water into which the said improvement is made." Sec. 49 provides that "No patent hereafter issued out of the land office shall impair or affect the rights of riparian proprietors, as explained and declared in the two preceding sections; and no patent shall hereafter issue for land covered by navigable waters."   JUDGE ALVEY said, in a concurring opinion in *Hess* v. *Muir*, 65 Md. 603, in speaking of that Act, that "The right given to improve out from the shore into the water was designed, manifestly, to embrace only structural improve-

ments, such as wharfs, piers, warehouses, *or the filling out from the shore and reclaiming the land from the inundation of the water.*" It is not shown in this case just how the land was formed between the line of 1816 and the present bulkhead line, but the proprietors had the right to fill out from the shore and reclaim the land and it may have been done in that way, or it may have been formed by natural causes. But however that may be, it is certain that the Legislature of 1816 never intended, when it called for the limits of the city as "running with and binding on the said main branch" of the river, that a strip of land so formed should deprive the city of the right to reach the water. It cannot be supposed that, when the Legislature called for the southern lines of the city running with and binding on something, which it was presumed to know might and probably would change, it intended to fix the limits as they existed at that date (1816). The owners of land whose deeds made similar calls were not limited to the highwater mark of the river, as it then existed, and surely the city should not be. It clear is therefore that the second prayer of the appellant, which undertook to so limit the city, was properly rejected, regardless of the admission made by the appellant in its petition for an appeal above referred to.

That brings us to the consideration of the first prayer, which asked the Court to rule that such portions of the property of the appellant as are located beyond the bulkhead line, established by the city, are not subject to taxation by it, or to assessment by the Appeal Tax Court. There can be no doubt that the right of the appellant to construct the piers depended upon its ownership of the contiguous land, which we have said was within the city limits, and, under sec. 48 above quoted, "such improvements and other accretions as above provided for shall pass to the successive owners of the land to which they are attached, *as incident to their respective estates.*" Because the appellant owned this land, which was in the city, it had the "exclusive right" to make these improvements, and there would seem therefore to be at least very strong equity in favor of the contention of the city. If instead of making

piers such as those described in this case the appellant had filled out from the shore with earth, stone or other solid material, and reclaimed the land over which the piers are, and had then erected valuable improvements upon them, there would seem to be no doubt that the city limits would have been extended so as to include that property.   If that be not so, then if every owner of land bordering on the river, in that neighborhood, reclaimed the land in front of his lot, the city would be cut off from the water, which manifestly was not contemplated by the Legislature.   It should not be forgotten that although the riparian owner has the right to reclaim the land, and to make improvements into the water in front of his original land, yet until he does so, the title to the land under the water is in the State, and hence is not subject to taxation. Baltimore County will not therefore be deprived of property on which it has been collecting taxes by treating the limits of Baltimore City as including these piers. ' It was decided in *Giraud* v. *Hughes*, 1 G. & J. 249, and *Casey* v. *Inloes*, 1 Gill 430, "that the right to make improvements in navigable waters granted by the Act of 1745, ch. 9, sec. 10, was a mere privilege of acquiring property by reclaiming it from the water, and that until the improvement was completed, no title was acquired by the adjacent owner," *Linthicum* v. *Coan*, 64 Md. 453.   And consequently it was held in *Casey* v. *Inloes*, that a grant from the State of land covered by navigable water, bounding the property of a riparian proprietor, who had not made the improvements, "intercepted" his right to afterwards make them.   Under the Code, the proprietor is now protected, by prohibiting the issue of a patent, but until he does make the improvements he has no interest in the land under the water on which his land borders, excepting such as the Act of 1862 or some other statute, if any, may give him.

In *Horner* v. *Pleasants*, 66 Md. 475, a wharf, built under the Act of 1796, ch. 45, was under consideration, and it was said that it was not necessary for the State to grant a technical fee in the land covered by the water, in order to give the improver the benefits intended by the statute, "But the State did

grant a *perpetual use* of such land for the purpose of erecting
and keeping up these wharves, and this valuable license or
franchise, as long as used, she can no more annul than she
could a patent in fee." In that case a commission was issued
for the partition of an intestate's estate, and a warehouse and
lot were assigned to an heir, but no express mention was
made of a wharf attached thereto in the report of the com-
missioners. Reference was, however, made to a deed which
was before them, and by which they were governed, convey-
ing the lot to the intestate and which conveyed the wharf by
the use of the terms "all and every the rights, privileges,
appurtenances and advantages to the same belonging or in any
wise appertaining," and the Court said "we must presume
that the commissioners allotted it in the same way, and that
the wharf passed." It was said in that case that the statutory
franchise to make the improvements in the water "was an in-
cident or appurtenance to the lots fronting on the water,"
which is the substance of what is declared in sec. 48 of Art.
54. It is true it was said in *Goodsell* v. *Lawson*, 42 Md. 373,
that "It does not follow from this, that the title to the im-
provements when made may not be severed from that of the
mainland, and be conveyed to and held by other persons hav-
ing no interest in the original tract. The right of the riparian
proprietor to such improvements necessarily carried with it
such powers of alienation as owner thereof," but under sec.
48 they would pass by a conveyance of the original land, un-
less restricted by the deed. In *Tome Institute* v. *Crothers*, 87
Md. 584, in speaking of similar rights granted lot owners in
Port Deposit, by the Act of 1824, ch. 33, JUDGE BRYAN said:
"When these extensions were made, they became statutory
additions to the original lots, and were held by the same title.
In fact, they were the original lots made larger. Their legal
identity was not changed by an increase of their dimensions."
In *Hess* v. *Muir*, *supra*, the Court said that the improvements
referred to in sec. 38 (now 48) of Art. 54 "are plainly, we
think, such structures as are subservient to the land, and
which used in connection with the land, enhance its value or

WEST. MD. T. R. CO. vs. BALTIMORE CITY.     569

Md.]                    Opinion of the Court.

enlarge its commercial or agricultural facilities, or other utility, to an extent the land alone would be incapable of, and in this way 'improve' it.   They are to be made 'into' the water, a term inconsistent with entire separation from the land. Wharves, piers and landings are examples of such improvements.    *   *   *   When such improvements are made they become incident to the estate, as not inherently identical in nature with land, but from being joined to it, and contributing to its uses and value legally identified with it, as a fixture or a right of way, or other appurtenance that passes with land." We have already quoted above from JUDGE ALVEY's concurring opinion, where he also speaks of the character of the improvements intended.

It would seem therefore to be perfectly clear that the Legislature never intended that such improvements as these should, for the purposes of taxation, be cut in two at the point of high water mark on the bank of the river when they were made, and part be taxed by the city and the rest by the county. Without the right to use the land, which is in Baltimore city, the improvements would be useless and, as they are incident to that land and dependent upon it for their existence, it would be an anomalous condition of affairs if they were to be thus divided.    They are so situated as to be dependent upon the city for police and fire protection and if the appellant's theory be correct they would practically have neither, as this water is separated from Baltimore County and it would be impossible to furnish the appellant with proper fire or police protection on these piers, unless the county made special provision for them, which would practically be impossible without the assistance of the city.   Of course we are aware that this is not conclusive of the question before us, and that if in point of fact the piers are beyond the limits of the city they cannot be taxed by it without special authority from the Legislature, if it be conceded that it could then be done which we need not discuss, but such considerations are very apposite in ascertaining the intention of the Legislature, and in determining how far the boundaries of a municipality on navigable water follow

those of the proprietors of land originally within the municipality, but extended, under the provisions of the statute.

We understand the learned counsel for Baltimore County, who also appeared in this case, to admit that a city's boundaries may be extended by natural accretion and that they "should be construed to embrace what is actually made land, wharves, permanently filled in with earth, and the like," to use the language of his brief, and we are of the opinion that such is the law, unless of course the provisions of a particular charter clearly prohibit such extension.    That being so, why should a distinction be made between such piers as are herein involved, and made land or wharves permanently filled in with earth.    The piles on which the piers rest are from 50 to 85 feet long and are about eight feet apart.    The water was from twelve to twenty feet deep and the piles are driven into the ground "to resistance" and extend about eight feet above mean low water.    The pile work cost about $120,000 and as the total costs of the piers, including the piles, was $400,000, it can be seen that they make what should certainly be regarded as permanent structures.    "A pier is defined as a projecting wharf or landing place."    22 *Am. & Eng. Ency. of Law*, 812.    In *The Haxby*, 94 Fed. Rep. 1016, it was said that "The Century Dictionary defines a pier to be 'projecting quay, wharf, or other landing place;' and, without some qualifying adjective this is the ordinary meaning of the word.    It may be a solid stone structure, or an outer shell of stone or wood filled in with earth; or it may be a frame work formed by fastening a platform of planks upon piles driven into the soil at the bottom of the water.    *In either event, it is a projection of the land, and for purposes of jurisdiction it should be so treated.*"    The opinion then goes on to distinguish between a floating pier and an immovable one.

The mere fact that these piers are built upon piles instead of on solid ground ought not to make any difference.    They are permanent structures and as effectually monopolize the use of the land under them as if they were built in one of the other ways mentioned "The Haxby."    They were probably

built so as to let the water pass under them by requirement of the city, as in one of the cases we have examined such an ordinance is referred to, and they are structures of the character that this Court has said was meant by the Legislature by the term improvements referred to in sec. 48 of Art. 54, and so far as the riparian owner is concerned he has precisely the same rights in a pier as he has in a wharf. It has been suggested, as one reason why the contention of the appellee should not prevail, that the law did not intend to give owners of property the power to extend the limits of the city by their acts, but it certainly did not intend that such owner could determine whether the limits should be extended either by building a pier such as these, and thereby not extend the limits, according to the appellant's contention, or by building a solid wharf, and thereby extend them. Our conclusion is that the city's jurisdiction extends over piers constructed and located as these are for the purposes of taxation, police and fire protection, etc. There are a number of cases in New York, in which State there is, as in Maryland, a great deal of navigable water, which have in effect adopted that view. *Udall* v. *Brooklyn*, 19 Johnson, 175; *Bechtel* v. *Edgewater*, 45 Hun. 240 (affirmed in 122 N. Y. 649); *Luke* v. *Brooklyn*, 43 Barbour, 54 (affirmed in 36 N. Y. 661); *Atlantic Dock Co.* v. *Brooklyn*, 3 Keys, 444, and *Tebo* v. *Brooklyn*, 134 N. Y. 341. Although some of these cases show that the water had been filled up, the principle established we approve of—especially when our statutes and the peculiar location of Baltimore as to the Patapsco river are taken into consideration. New York County extended to the Brooklyn side of the river but notwithstanding that, the properties were held to be in Brooklyn. The cases relied on by the appellant, such as the *Fort Smith Bridge Co.* v. *Hawkins*, 54 Ark. 509; *Louisville Bridge Co.* v. *Louisville*, 81 Ky. 189; *C. B. & Q. R. R.* v. *Cass Co.*, 51 Neb. 369, and *Sioux City Bridge Co.* v. *Dakota Co.*, 61 Neb. 75, involved bridges and presented different questions from that in this case. *Gilchrist's case*, 109 Pa. 600, was not unlike, in principle, *Hess* v. *Muir*, and does not reach the question now

572. WEST. MD. T. R. CO. vs. BALTIMORE CITY.

Opinion of the Court.                                     [106

before us.   Ordinarily there could be no reason for a municipality, the boundaries of which only extended to the bank of a river, being permitted to tax a bridge beyond the bank, but in this case for reasons we have given we are of the opinion that the city's boundaries are co-incident with those of the proprietors of lands bounding on this river, which have been extended under and by virtue of the statute and that these piers are such improvements as come within the principle referred to above.

The only remaining question we will discuss is the effect of the case of *Raab* v. *State*, 7 Md. 483, which the appellant relied on as conclusive of this case.   There are expressions in the opinion which may give some foundation for the reliance on it, but when it is carefully considered it will be seen that there is nothing in it which is contrary to the conclusion we have reached.   The question there involved was whether Anne Arundel County was "an adjoining county" to the city of Baltimore, within the meaning of the constitutional provision then in force, relating to the removal of cases, and it was held that it was not, because Baltimore County still had jurisdiction over the river at the place involved, which is near where these piers are.   The lines of Baltimore County originally embraced what is now a part of Anne Arundel and was by the Act of 1726 limited to the south side of the river.  Our predecessors held that after the Act of 1726 the river remained, as it had been for many years, within the limits of Baltimore County, except so far as affected by the Act of 1704, ch. 92, which provided that every county lying on any navigable river in the province should extend its jurisdiction from the shore to the channel of such river, and be divided from the other county by the channel. Our predecessors did not pass on the Act of 1704, but held that the river was still in Baltimore County at least as far as the channel, and was subject to the jurisdiction of its Courts. In *Acton* v. *State*, 80 Md. 547, we held that the jurisdiction of Anne Arundel County did extend to the channel of the Patapsco river—the question which had been left open in

Raab's case.   If we were construing the Act of 1704 (which is now sec. 147 of Art. 75 of the Code), without regard to the decision in Raab's case, we would be inclined to adopt a similar view to that of JUDGE BREWER, who decided in the lower Court that by the Act of 1816, ch. 209, the jurisdiction of Baltimore City extended to the middle of the river, because he thought that when that part of Baltimore County was added to the city, it could not have been intended by the Legislature to leave under the control of the county the water from the shore to the middle of the river, and as the policy of the State, as declared by the Act of 1704, was to extend the jurisdiction of counties to the channels of navigable rivers it should likewise be construed to apply to Baltimore City. When Baltimore City was vested with control over the land to the shore it does seem to be singular that an important city like it was then, with the prospect of becoming much more so as it has, should be limited to the line on the shore while the counties could go the channel.   But without overruling that case, but leaving it to the further action of the Legislature if it deem it proper to change the law in reference thereto, it is clear that *Raab* v. *State*, does not conflict with what we have said above.   If the conditions that now exist had existed in 1855, when the Raab case was decided, the Court could have reached the same conclusion it did in that case, for there would still be an intervening jurisdiction between Anne Arundel and Baltimore City, after extending the limits of the city, so as to include these piers.   Indeed, we have considered this case with the concession that up to the time the piers were constructed, the river was under the control of Baltimore County up to the high water mark on the north side of this main branch.   That case can therefore in no way be said to be in conflict with this, and we will affirm the order of the lower Court.

<div align="right">

*Order affirmed, the appellant to pay*
*the costs.*