STATE OF MARYLAND, to Use of PRYOR et al., v. MILLER et al.

(District Court, D. Maryland. June 21, 1910.)

1. NAVIGABLE WATERS (§ 38*)—IMPROVEMENT—RIGHTS ACQUIRED.

    Code Pub. Gen. Laws Md. 1904, art. 54, § 48, gives to the proprietor of land bounding on navigable waters of the state the exclusive right to make improvements into the water in front of his land, and declares that such improvements shall pass to the successive owners of the land, to which they are attached as incident to their respective estates. *Held,* that the right under such section to make improvements in navigable waters is a mere privilege of acquiring property by reclaiming it from the water, and that until the improvement is completed no title passes to the adjacent owner.

    [Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 228–238; Dec. Dig. § 38.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes.

2. COURTS (§ 259*)—ADMIRALTY JURISDICTION—STATE LAW.

A state has no power by legislation to restrict the jurisdiction of the federal courts in admiralty.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 795, 796; Dec. Dig. § 259.*]

3. NAVIGABLE WATERS (§ 1*)—ADMIRALTY (§ 4*)—WATERS NAVIGABLE IN FACT—JURISDICTION.

Waters navigable in fact are navigable in law, and are within the jurisdiction of federal courts of admiralty, regardless of the title to the soil under the water.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. § 7; Dec. Dig. § 1;* Admiralty, Cent. Dig. §§ 38-68; Dec. Dig. § 4.*]

4. ADMIRALTY (§ 21*)—WRONGFUL DEATH—MARYLAND STATUTES—ENFORCEMENT.

Code Pub. Gen. Laws Md. 1904, art. 67, §§ 1, 2, creating a cause of action for wrongful death, and providing for assessment of damages by a jury, is not for that reason unenforceable in the federal courts of admiralty sitting in that state by a libelant to recover for wrongful death happening in consequence of a negligent obstruction in the navigable waters of the state; the right of trial by jury not being indispensable to the enforcement of the right conferred.

[Ed. Note.—For other cases, see Admiralty, Cent. Dig. § 219; Dec. Dig. § 21.*

Jurisdiction of torts, see note to Campbell v. H. Hackfeld & Co., 62 C. C. A. 279.]

5. WHARVES (§ 20*)—OBSTRUCTION—BULKHEAD—SUBMERGED PILES—NEGLIGENCE.

Defendants M. purchased certain land on a navigable portion of the P. river, a short distance east of the corporate limits of Baltimore, and there constructed an amusement park. They then started the construction of a timber bulkhead from each end of the shore line, to run into the river about 600 feet. Prior to the accident, the south bulkhead had been nearly completed, and work had been begun on the west bulkhead; four rows of piles having been driven northward which had not been cut off, and at the time of the accident were standing 7 feet above the water. On the north bulkhead for 175 feet from the shore, these piles had been cut off and the platform completed, but for the next 200 feet they had been cut off but not capped, and for the remaining 200 feet further out the piles were still standing as driven, projecting 2 to 6 feet above the water. The piles had remained in this condition for a considerable time, during which rowboats and small vessels approaching the resort had grounded on the submerged piles. On the day of the accident, libelant drove his launch to the resort to attend a picnic, and while taking certain of the picnickers for a ride in the launch, without any knowledge or warning as to the submerged piles, ran his launch on to them, causing injury to the launch and injury to and death of certain of its occupants. The water over the submerged piles was apparently clear, and defendants M. took no precautions to disclose their presence or warn libelant of the danger, though they had opportunity to do so. *Held*, that the accident was not caused by libelant's incompetent navigation, but by the negligence of defendants M., for which they were liable.

[Ed. Note.—For other cases, see Wharves, Cent. Dig. §§ 35-43; Dec. Dig. § 20.*]

6. NAVIGABLE WATERS (§ 19*)—"HIGHWAYS"—WATER COURSES—NEGLIGENT OBSTRUCTION—CITY'S LIABILITY—STATUTES.

Acts Md. 1908, c. 148, confers power on the city of Baltimore to provide for the improvement of the P. river, to remove therefrom anything detrimental to navigation, and to regulate the erection and maintenance of bulkheads, etc., therein. The act also authorized the city to provide for

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

the appointment of officers necessary to execute such powers, and to impose fines and penalties for breach of any ordinance in conformity with the act. Pursuant thereto, an ordinance was adopted directing the harbor board to require all defective wharves or bulkheads to be rebuilt or repaired within a reasonable time, to be prescribed by notice, and imposed a fine of $10 a day on any owner failing to comply therewith. *Held*, that navigable water within the corporate limits of a city and over which the city is given control is not a "highway" in the same sense as a city street, and that the city's mere omission to perform its duty imposed by such act to inspect a bulkhead in the P. river, which was dangerous to navigation, did not render the city liable for injuries to libelant's launch caused by grounding on certain of the submerged piles belonging to the bulkhead, nor for injury to and death of passengers on the launch caused by the same accident.

[Ed. Note.—For other cases, see Navigable Waters, Dec. Dig. § 19;* Municipal Corporations, Cent. Dig. § 1806.

For other definitions, see Words and Phrases, vol. 4, pp. 3291–3306; vol. 8, p. 7678.]

7. NAVIGABLE WATERS (§ 19*)—OBSTRUCTIONS—INJURIES.
    County commissioners of a county, by reason of being required to keep its roads, bridges, and highways free and unobstructed, were not responsible for injuries resulting from the grounding of a launch on submerged piles in a navigable river within the county, negligently permitted to constitute an obstruction to navigation.

[Ed. Note.—For other cases, see Navigable Waters, Dec. Dig. § 19;* Counties, Cent. Dig. § 210.]

8. DEATH (§ 95*)—DAMAGES—CHILDREN.
    Where a child 19 years of age received $4.50 a week as a machinist's apprentice, $3.50 of which he paid to his father, who furnished him board, lodging, and clothing, and did other work at home of a pecuniary value, his father was entitled to recover $700 for his wrongful death under the Maryland law, limiting the parents' damages to such pecuniary benefit as they might reasonably have expected from the son prior to his coming of age.

[Ed. Note.—For other cases, see Death, Cent. Dig. § 120; Dec. Dig. § 95.*]

9. DAMAGES (§§ 97, 99*)—INJURIES—MARRIED WOMAN.
    A married woman injured by the grounding of a launch on certain submerged piles was confined to her bed for nearly four weeks after the accident, and, while somewhat hard of hearing before, became very deaf thereafter. Her eyesight also appeared to be injured, and she was greatly shocked by fright from being in the water a considerable time before she was rescued. She had previously been a strong healthy woman and had done the family housework, including the family washing; but since became exceedingly irritable and unwilling to talk upon any other subject than the accident and religion. *Held*, that she was entitled to an allowance of $1,000, and her husband to an allowance of $500.

[Ed. Note.—For other cases, see Damages, Dec. Dig. §§ 97, 99.*]

10. DEATH (§ 95*)—WRONGFUL DEATH—AMOUNT ALLOWED.
    Decedent, a woman 48 years of age, wrongfully killed, left a husband 46 years old and eight children, aged from 12 to 18. She had previously done all her family work except the laundry without a servant, and since her death the house had been cared for by E., a daughter of 15. *Held*, that the husband was entitled to recover $3,000 and the daughter $500; the other children being regarded as having suffered no pecuniary loss.

[Ed. Note.—For other cases, see Death, Cent. Dig. § 120; Dec. Dig. § 95.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

**11. DEATH (§ 95\*)—OF CHILD—AMOUNT RECOVERED.**

Where a bright healthy boy 10 years of age was killed as the result of a collision between a launch and certain submerged piles, the father was entitled to recover against the owner of the piles $1,500.

[Ed. Note.—For other cases, see Death, Cent. Dig. § 120; Dec. Dig. § 95.\*]

In Admiralty. Libels by the State of Maryland, for the use of James V. Pryor and others, against Andrew Miller and another; the Mayor and City Council of the city of Baltimore, and Henry P. Mann and others, constituting the Board of County Commissioners of Baltimore County. Decree for complainants as against defendants Miller and wife, and dismissed as to the other defendants.

Robert H. Smith, Raymond S. Williams, Arthur L. Jackson, Henry W. Fox, Jacob S. New, Edward B. Eisenbrandt, and Philip B. Watts, for libelants.

Morris A. Soper, Edgar Allan Poe, Edward H. Burke, James J. Lindsay, and Arthur D. Foster, for respondents.

ROSE, District Judge. On August 5, 1909, the gasoline launch Oukid struck on submerged piles in the Patapsco river. It sunk. Five persons then on board were drowned. At least one claims to have been severely and permanently injured.

By the law of Maryland:

"Whenever the death of a person shall be caused by wrongful act, neglect or default, and the act, neglect or default is such as would, if death had not ensued, have entitled the party injured to maintain an action and recover damages in respect thereof, the persons who would have been liable if death had not ensued shall be liable to an action for damages notwithstanding the death of the person injured. * * * Every such action shall be for the benefit of the wife, husband, parent and child of the persons whose death shall have been so caused, and shall be brought by, and in the name of, the state of Maryland for the use of the person entitled to damages, and in every such case the jury may give such damages as they think proportioned to the injury resulting from such death to the parties respectively for whom and for whose benefit such action shall be brought. And the amount so recovered * * * shall be divided among the above-mentioned parties in such shares as the jury by their verdict shall find and direct." Code Pub. Gen. Laws Md. 1904, art. 67, §§ 1, 2.

Original and intervening libels have been filed by the state of Maryland to the use of James V. Pryor and Annie M. Pryor, parents of Frank S. Pryor, and to the use of Abraham Brown, husband of Katherine E. Brown, and to the use of Charles L. Brown, Ralph A. Brown, Eleanor M. Brown, and Edgar K. Brown, children of Katherine E. Brown, and to the use of George Thomas Leach and Eva C. Leach, parents of Willard T. Leach; Frank S. Pryor, Katherine E. Brown, and William T. Leach being three of the persons who lost their lives by the sinking of the launch. Joseph C. Houck and Mary A. Houck, his wife, were also libelants claiming to recover, the latter for injuries suffered at the time of the accident, and the former for the loss of the service and companionship of his wife thereby occasioned. James G. Pryor, the owner of the launch, was also a party to the libel seeking to recover for the damage to it.

\*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

I find from the evidence the facts to be as follows: One of the respondents, Andrew Miller, is now, and for a number of years has been, a builder of wharves and bridges. Some years ago he bought a tract of some eight acres of land lying along the north shore of the Patapsco river in Baltimore county about two miles east of the corporate limits of Baltimore City. He had the deed for this property made out to his wife, who is an invalid and has been such for a number of years. Since the land was conveyed to her he testifies that he has managed it as he saw fit. He has not accounted to her for its rents or profits because he has spent much more than they amounted to upon it.

More than three years before the accident he decided to build a timber bulkhead from each end of the shore line of his land. These bulkheads were each to be about 600 feet long and were to run out into the river substantially at right angles with the shore line. It was his intention at some time to connect the off shore ends of these bulkheads with each other by the construction of another bulkhead in a direction which would be substantially parallel to the shore line.

For convenience, that one of these bulkheads which ran into the river from the southwestern corner of the Miller land will be called the "South bulkhead," that which ran out from the Northwest corner the "North bulkhead," while the third or connecting bulkhead will be called the "Western."

He expected some time to fill in the space inclosed by these three bulkheads and the shore line so as to make such space fast land. When this was done his shore would be carried out about 600 feet. Some eight acres would be added to its area. Apparently this filling in was to be postponed until some indefinite time in the future. In the meanwhile his plan was to construct the North and the South bulkheads and a part of the West. There would thus be left a space unobstructed by piling. Through this space his pile drivers could be towed to and fro and timber and other materials could be brought into and taken out of the sheltered lagoon or harbor formed by the construction of a North and South and a part of the West bulkheads. Such a sheltered place would be of value to him, as his shore was otherwise much exposed to the wind and waves. For the purpose of storing his timber and other material within the lagoon, he planned to erect platforms standing out in its waters.

The law forbade the construction of wharves, piers, or bulkheads on the Patapsco river within four miles of Baltimore City without a permit from the harbor board of Baltimore City, which permit he obtained in the summer of 1906.

Miller testified that he intended to employ his men and machinery in doing this work when he was not using them in his buisness of building wharves and driving piles for other people. The work at this shore therefore proceeded probably much more slowly than would otherwise have been the case.

By the early summer of 1909 the South bulkhead had been completed, or nearly so. Two or more rows of piles had been driven for its entire length. They had all been cut off and capped. For more than half the distance a completed platform had been built on them.

Work had begun on the West bulkhead. Beginning at the West end of the South bulkhead four rows of piles had been driven northward for something over half the distance between the North and the South bulkheads. These piles had not been cut off. At the time of the accident they were standing about seven feet above the water. All the piles for the North bulkhead had been driven. For 175 feet, or thereabouts, from the shore they had been cut off and capped. The platform over them was completed. For the next 200 feet, or thereabouts, they had been cut off but had not been capped. On the day of the accident their tops appear to have been from a foot to 15 inches below the water line. For the remaining 200 feet of the North bulkhead—that is, the 200 feet farthest out—the piles were still standing as they had been originally driven. They had not been cut off and projected from two to six feet above the water. The North bulkhead did not run out for the whole distance in one line. At a point about 400 feet from the shore it turned at right angles and ran south for some 40 feet. Then, making another right angle, it continued its westward course. The piles of the North bulkhead which on August 5, 1909, were visible above the water were those which extended from its western end to the bend in its line. Before any of these bulkheads were built, the water, afterwards partially inclosed within them, was part of the Patapsco river. Nothing lay between it and the main ship channel except an expanse of open and navigable water. The respondent Miller offered evidence which showed that that water was still navigable not only at the time of the accident but at the time of the hearing of the case in court. One of his witnesses, a tugboat captain, testified that he supposed he had taken his tug, drawing from 6 to 8 feet of water, into the lagoon 500 times. He said he had been in as late as the latter part of May or the first of June, 1910.

Miller had fitted up his land as a picnic resort. He had equipped it with patent swings, bowling alleys, dancing pavilions, rifle ranges, and the like. During the summer of 1910, and before the accident, it had been frequently rented by him as such a resort.

Miller did not undertake to say how long before the accident the submerged piles in the North bulkhead had been in that condition. The evidence satisfies me that they had been cut off at least six weeks before the date of the accident, and perhaps much longer. During those six weeks a number of boats struck on these piles. In the latter part of June, 1909, Landmark Lodge A. F. & A. M. held a picnic at Miller's shore. Messrs. Robert L. Gill and W. G. Speed, members of the Baltimore bar, went down to the picnic in a launch. They ran on the same piles that afterwards caused the accident. They were moving at half speed at the time. Their launch had a bow four inches thick. They were aground for some while, but their boat was not injured.

On July 4, 1909, George W. Williams attended the picnic of the Canton Methodist Episcopal Church at the same shore. He took some children out in a rowboat and went aground on the same piles. He saw another boat fast on them.

One Charles M. Lubben was the owner of a launch. He had been in the habit of using it for hire in and about the harbor of Baltimore.

180 F.—51

One Sunday early in July, 1909, he was called on during a squall to take a baseball club from Wagner's Point to Miller's Park. He had 32 people on board. He ran on these same piles. His launch was jambed between two of them. He made the people on board step to the port side of the launch and keep it fast down on the piles. There were two good swimmers aboard. They jumped overboard with a long line and swam ashore. Three or four rowboats came from Miller's Park and took off the launch all but four or five of those in it. When so lightened it floated off. It was damaged to the amount of $85. He sent the bill to Miller. Miller says he received it before the fatal accident but paid no attention to it.

On the 16th of July Frederick S. White was at a picnic at the park. He hired a rowboat from Miller to take some children out rowing. He struck on the piles.

The persons killed and injured on August 5, 1909, were members or friends of the Waverly Baptist Sunday School. Miller had rented his grounds for that day to that school. No steamer runs to the shore. The ordinary means of reaching it is by the trolley lines of the United Railways. The cars run within a few yards of the land entrance to the park. This particular Sunday school came to the grounds in the cars. Miller was on the grounds that day. He suggested to the superintendent of the Sunday school to hire all his rowboats for the day so that the school could hire them out at an advance to the persons who wanted to use them. The superintendent did not accept the suggestion. He says he did not care to have anything to do with the boats.

The libelant, James G. Pryor, was a machinist. At the time of the accident he was about 28 years old. He knew how to build gasoline engines for use in motor boats. He had built or helped to build two or three before undertaking to build one for a boat of his own. He bought the hull of the launch for $65. He built an eight horse power gasoline engine. He installed that engine in the launch which he fitted up in other ways. He says that the launch in all cost him $261. In this figure he includes the time he spent on it at the price he received for his labor as a machinist. He testifies that he could not have bought an engine of the same power and as well constructed for less than $325 to $350. He lived in the vicinity of the Waverly Baptist Sunday School. Various members of his family were connected with the school. He took his immediate family and friends down to Miller's shore on his launch. He entered the lagoon from its west side; that is to say, through the opening which Miller had left there for the purpose of affording water ingress. His launch was 27 feet long with a 6-foot 6-inch beam. Its cockpit was 14 feet long by 5 feet nine inches wide. It drew from 18 to 24 inches of water. When he arrived at the shore, he saw two other launches tied up within the lagoon. One of them belonged to Miller. It appears to have been a launch of about the same length as Pryor's. It had a cabin on it and was heavier in construction. Shortly after Pryor reached the grounds, he invited the superintendent of the Sunday school and a number of other persons to go out with him for a short trip on the water. The invitation was accepted. He took the launch out through the opening of the West

bulkhead and returned the same way. When he came back with his first load he invited others to go. On the second and fatal trip there were on board 18 persons; 11 of these were adults and 7 children. The latter ranged in age from an infant in arms to boys and girls of about 15. Pryor says the launch had seats for two more; that it was not overcrowded; that he had previously had 21 full grown men in it at one time. There was scarcely any wind, and the water was smooth. When this party started out, Miller was on the wharf about to get into his own launch. Miller did not say anything to Pryor, and neither then nor at any other time told him or anybody connected with the Sunday school anything about the submerged piles.

The persons who went out in the Pryor launch boarded it at a platform in front of the bathhouses. A breakwater extends north and south in front of the bathhouses and at about right angles to the platform on which it stands. It was necessary for the launch to run south to the end of the breakwater. It then turned west around its southern end. It had then to lay its course for some distance in a northerly direction substantially parallel to the shore line. It had to do this because directly in front of the breakwater and about 200 feet out from it was a large platform upon which Miller had piled old timber. When the launch had gotten by this platform, there appeared to be straight ahead an opening in the North bulkhead about 200 feet wide. Beyond the opening to the west, or riverward, there was piling projecting above the water. From the shore a platform ran out. The length and character of this platform would not have been very perceptible to one in the launch; the view of it being in part obscured by another platform standing out in the waters of the lagoon, upon which latter platform was piled old timber.

There was, of course, another apparent way to get out of the lagoon. Pryor could have gone out through the opening in the West bulkhead. He had been through that three times before. The west opening was further off. To go through it involved a sharp change in the course and would carry the launch farther from the shore. Pryor thought there was open water ahead. Like the other persons at previous picnics who became entangled in the piles under the water, he did not suspect their presence.

At the request of the proctors for the libelants and respondents, I, in their company, visited the scene of the accident. It seems to me that Pryor did what many, if not most, men under the circumstances would have done.

He says he was making from four to six miles an hour. He was steering the boat. His younger brother, himself an apprentice machinist who had served four years at his trade, was managing the engine. The first warning he had of danger was when the launch struck the piles. It rebounded from them and then again went forward against them. The engine was at once stopped. The water began to run in through a hole in the side of the bow. After the launch was raised, this hole was found to be about 14 inches long. At one end it was from 4 to 6 inches wide. It tapered to a point. Pryor called to those in the launch to come forward. He wanted to keep the bow of

the launch down on the piles so that the piles would prevent its sinking, but when the water ran in the women and children crowded away from it to the stern of the boat. He then called to his brother to help him tear off the awnings. He succeeded in getting most of them off when the stern went down, and those in the boat were thrown into the water.

Some persons were out in the lagoon in rowboats. They at once started towards the launch. Other persons on shore got into other rowboats and came out to help. Two of the rowboats bound on this' mission themselves went aground on the piles, and delay was thus caused.

When the Oukid struck on the piles, Miller in his own launch was in the lagoon and headed for the opening in its Western bulkhead. When his attention was called to the accident, he kept on through that opening and turned around the seaward side of the South bulkhead to get to the scene of the accident. His engine refused to work, and it was some time before he reached the spot.

Five of those in the launch were drowned. Two of them were adults, Mrs. Brown and Frank S. Pryor. Three were children. Mrs. Houck, one of the libelants, was in the water for some time. She was in a serious condition for some hours after the accident. She was confined to her bed for several weeks thereafter. She claims to have been permanently and seriously injured.

Under these circumstances, respondents say that this is not a case of admiralty and maritime jurisdiction: First, because the place in which the accident happened is not within the admiralty jurisdiction; and, second, that the admiralty has no jurisdiction to enforce the liability imposed by the Maryland form of Lord Campbell's act. These contentions will be considered in the order in which they have been stated.

Section 48 of article 54 of the Code of Public General Laws of Maryland gives to the proprietor of land bounding on any of the navigable waters of the state the exclusive right of making improvements into the waters in front of his land, and declares that such improvements shall pass to the successive owners of the land to which they are attached as incident to their respective estates.

The Millers say that by virtue of this provision of law the water where the launch sank was no longer public water, but was their private property. A number of Maryland cases were cited in support of this contention. I do not think that any of them sustain it.

Under the Maryland law the right to make improvements in navigable waters is a mere privilege of acquiring property by reclaiming it from the water. Until the improvement is completed no title is acquired by the adjacent owner. Western Maryland T. R. Co. v. Baltimore City, 106 Md. 567, 68 Atl. 6; Giraud v. Hughes, 1 Gill & J. (Md.) 249; Casey v. Inloes, 1 Gill (Md.) 430, 39 Am. Dec. 658; Hawkins Point Lighthouse (C. C.) 39 Fed. 86.

The contention of the Millers in this respect is untenable for another reason. It is not in the power of any state to say that the admiralty shall not have jurisdiction over any waters which but for that legisla-

tion would be subject to that jurisdiction. Workmen v. New York City, 179 U. S. 552, 21 Sup. Ct. 212, 45 L. Ed. 314.

The waters in which the accident happened were navigable in fact. Tugboats drawing from six to nine feet of water habitually make commercial use of those waters. Being navigable in fact, they are navigable in law. The Daniel Ball, 10 Wall. 563, 19 L. Ed. 999.

It is immaterial who has the title in the soil under water which is navigable.

In Panama R. R. Co. v. Napier Shipping Co., 166 U. S. 280, 17 Sup. Ct. 572, 41 L. Ed. 1004, the accident occurred in a slip between two piers. The piers and the slip were the private property of the respondents. It was held the admiralty jurisdiction extended over such waters.

The dry dock in which the steamship Jefferson was at the time salvage service was performed on her was private property, yet the steamship was within the admiralty jurisdiction. Steamship Jefferson, 215 U. S. 130, 30 Sup. Ct. 54, 54 L. Ed. ——.

But, secondly, it is said that the Maryland form of Lord Campbell's act does not give any right which can be enforced in admiralty. Mr. Burke, the junior advocate for the respondent Miller, has submitted a very learned and ingenious argument in support of this contention. He says that the Maryland act provides that the jury may give such damages as they may think proportioned to the injury, and that the jury shall direct in what proportions the amount recovered shall be divided among the parties. He argues that participation of the jury is an essential part of the process given by the Maryland act. The courts of admiralty have no juries. Therefore he says the right given by the Maryland statute cannot be enforced in the admiralty.

There is no question that a jury trial under the Maryland statute may be waived in the Maryland courts. Wherever Lord Campbell's act has been adopted in any form in any of our states, the right of action given has been a right of action at common law. By all, or nearly all, of the state Constitutions, the parties to an action at common law are entitled as of right to a jury trial. The language of the Maryland statute makes the participation of a jury no more and no less essential to the giving of the relief sought than do the constitutional provisions in other states. That in a proper case, where some form of Lord Campbell's act is law, recovery may be had in admiralty for injuries resulting in death, is now settled law.

In a number of cases extending over a series of years this court has held itself competent to give such relief. I have no question that under the allegations and proof this case is one of admiralty jurisdiction.

In passing on the merits it will be convenient to consider first whether the deaths and injuries were caused by the wrongful act, neglect, or default of the Millers. Her advocates at the hearing conceded that Mrs. Miller is liable if Mr. Miller is. She allowed him to manage the property as he saw fit. The neglect and default of Miller to give warning that there were submerged piles at the place of the accident was its proximate cause. It is true that the respondents have

offered testimony of experienced tugboat captains to the effect that
when they see a line of capped piles running out from the shore, and
then apparently clear water and beyond a line of piles standing above
the water, they suspect that there may be submerged piles between the
capped shore piles and the high standing seaward piles. I do not ques-
tion this evidence. A vessel as large as a tugboat would scarcely run
the risk of going close to shore in unknown waters when those on
board saw that piling operations had been going on in the vicinity.
Miller testifies, as do several persons in charge of the city's wharf and
pier construction, that they are not in the habit of marking piles dur-
ing the time which elapses after those piles have been cut off below the
water line and before they are capped. They say that if high piles be
left at the seaward end of the row it is sufficient notice that there
may be danger inside them. I do not think that this evidence has
much relevancy to the question in hand. Miller used his shore for a
special and particular purpose. The standard of care to which he
must be held is, in large part fixed by the nature of the use to which he
was putting his property. He had fitted up his grounds as a picnic
resort. He rented them for that purpose and derived a revenue there-
from. He was bound to consider the probable use to which the per-
sons who frequented the shore at his request would naturally put his
grounds and the waters adjacent thereto. He kept rowboats for hire.
That was a representation that his lagoon was safe for rowboats.
I do not think that it was. It is true that none of the rowboats which
ran on the piles were upset. It does not follow that they were not
thereby put in danger of upsetting. There are a great number of
power boats now in use. The keeper of any picnic shore near a large
city like Baltimore must know that people would sometimes come to
that shore in power boats and launches. He knew that power boats
had come in before. He says that he had told some of these boats to
keep out. He does not claim that he ever told anybody connected with
this boat to stay away. He admits he was standing on the wharf at
the very moment the Oukid started on its fatal trip. The bill which
he admits he received from Lubben warned him that there was dan-
ger. He kept his own launch in the lagoon. It was at the wharf at
the time Pryor's boat started on its last trip. He must have known
that many persons perfectly competent to run power boats in moderate
weather were not experienced navigators used to the management of
large vessels.

I feel that in not giving some warning that this stretch of apparently
open water was not safe, as it appeared to be, he was negligent, and
greatly so.

The fact probably is that Miller knew a great deal more about
wharf and bridge building and pile driving than he did about keeping
a picnic resort. He doubtless thought that if he furnished the grounds
and provided some amusements on them he had done all that was in-
cumbent on him. He knew the piles were there. It does not seem
to have occurred to him that everybody else would not know it as well.
His mind and attention were concentrated on his pile driving work.
He says himself that after the accident somebody told him that all on

the launch had been saved. He testifies that he made no further inquiry and sailed some miles away on his launch to visit a place where his men were at work. I do not mean that he gave no thought to the picnic business. As to some of its details he was very careful and methodical. A couple of days after the accident at which five persons connected with the Waverly Baptist Sunday School were killed in front of his grounds, the school received from him a bill for $2.20 for broken dishes.

I doubt not that he has worked very hard for all he has. I regret to be called on to pass a decree which may perhaps bear heavily upon him. I cannot escape from the conclusion, however, that the accident happened because he did not take some precautions which he could have taken and should have taken.

The respondents contend that the libelant, James G. Pryor, brought about the accident by careless and incompetent navigation. I do not feel that this criticism is well founded. Mr. Pryor seems to have been perfectly competent to manage his launch in good weather and smooth water. I do not think that the launch was overcrowded, bearing in mind the condition of wind and weather. The accident happened because the launch ran on the piles which stove a hole in its bottom. It really makes in this case very little difference whether Pryor was or was not in fault. Miller, from my point of view, certainly was. It is admitted that Pryor's negligence, if there was any, could not be imputed to the other persons on the launch. It is relevant merely with reference to his claim for the damage done his launch.

The libelants say that the mayor and city council of Baltimore, which is the corporate title for the municipality of Baltimore City, is liable. They say chapter 148 of the Acts of 1908 of the General Assembly of Maryland conferred upon the city of Baltimore "power to provide for the preservation of the navigation of the Patapsco river and tributaries. * * * To provide for the improving, cleaning and deepening of said river and tributaries and the removal therefrom of anything detrimental to navigation or health, * * * and to authorize the erection and maintenance of, and to make such regulations as it may deem proper, respecting wharves, bulkheads, piers and piling, and the keeping of the same in repair so as to prevent injury to navigation or health."

The act further empowers the city to "provide for the appointment of such officers and employés as may be necessary to execute the aforegoing powers and to impose fines and penalties for a breach of any ordinance passed in conformity with the act."

By municipal ordinance approved April 10, 1909, the harbor board, one of the municipal boards, was directed to require all private wharves or bulkheads that are decayed or defective, or likely to be injurious to navigation or to health, to be rebuilt or repaired within a reasonable time to be prescribed in a written notice not less than 30 days, to be served on the agent, owner, or occupier of such wharf or bulkhead, and imposed a fine of $10 a day on any such agent, owner, or occupier who failed to comply with the requirements of the notice.

It was admitted that the city made no inspection of Miller's work

while it was in progress, and that it was not its practice to make any inspection of like constructions beyond observing whether they did or did not extend beyond the pier-head line.

If the city is charged by the act of assembly with any duty to keep safe navigation of the portion of the river included within the exterior lines of Miller's bulkhead, and if the ordinance above referred to has been passed in partial discharge of that duty, no attempt has been made by the city to enforce said ordinance with relation either to Miller's bulkhead or to other bulkheads or constructions of a similar kind.

More than half a century ago the Court of Appeals of Maryland declared:  .

"It is a well-settled principle when a statute confers a power upon a corporation to be exercised for the public good, the exercise of the power is not merely discretionary but imperative, and the words 'power and authority' in such case may be construed 'duty and obligation.'"  Mayor & City Council of Baltimore v. Marriott, 9 Md. 174, 66 Am. Dec. 326.

In that case the city was held liable to an individual who had slipped on the ice which had been allowed to accumulate on one of the city's sidewalks. There was a city ordinance which required the removal of snow and ice. The city had made no attempt to enforce it. The principle stated in Marriott's Case is still the recognized law in Maryland.

A municipality which does not prevent boys from making a practice of coasting on its streets is liable for injuries occasioned by their sleds. Taylor v. Mayor of Cumberland, 64 Md. 68, 20 Atl. 1027, 54 Am. St. Rep. 759.

When it allowed "cows armed with dangerous horns and equipped with annoying bells" to wander in its streets, it was liable for injuries occasioned to a passer-by who was "violently horned, tossed, thrown, and trampled upon." Cochrane v. Frostburg, 81 Md. 54, 31 Atl. 703, 27 L. R. A. 728, 48 Am. St. Rep. 479.

It is liable to a foot passenger knocked down by a bicycle when it had permitted bicycle riders, in spite of a municipal ordinance to the contrary, to ride on the streets and sidewalks at an immoderate rate of speed. Hagerstown v. Klotz, 93 Md. 437, 49 A. 836, 54 L. R. A. 940, 86 Am. St. Rep. 437.

The libelants assert that a submerged obstruction in navigable water is in itself a nuisance. They rely on Harmond v. Pearson, 1 Campbell, 515. In that case Lord Ellenborough said:

"It is a peremptory law of navigation that, when any substance is sunk in a navigable river so as to create danger, a buoy should be placed over it for the safety of the public."

The same rule was laid down in Philadelphia, Wilmington & Baltimore R. R. Co. v. Philadelphia & Havre De Grace Steam Towboat Co., 23 How. 217, 16 L. Ed. 433.

Their contention, therefore, may be briefly summed up as follows: The submerged pile was a nuisance. The city was given power to compel its removal. The city did not exercise reasonable diligence or any diligence whatever to cause the pile to be removed, and is liable.

It will be noticed that all these Maryland cases are cases in which

the city failed to keep its streets and highways free of nuisance. A similar rule has been applied to county roads and bridges. County Commissioners of Anne Arundel County v. Duckett, 20 Md. 468, 83 Am. Dec. 557.

The language in which the principle is stated, it is true, is broad enough to render the city liable for things other than those which affect the use of its streets; but I do not find in any of the authorities cited, or with which I am familiar, that in point of fact this liability for the simple nonuse of powers given to it has in point of fact ever been extended beyond the class of cases above mentioned.

Ordinarily the law is said to be that municipal corporations are not liable for either negligent omissions or commissions in the performance of duties for which they receive no pecuniary profit, but which are imposed upon them as mere governmental agencies to which, however, there is one well-established but anomalous exception, and that is the rule which holds municipal corporations liable for permitting their streets and highways to be defective or out of repair. Gullikson v. McDonald, 62 Minn. 278, 64 N. W. 812.

Municipal liability for not keeping its streets safe extends in Maryland further than is stated in the case above mentioned. But the Maryland courts do recognize that there is a distinction and that for the nonexercise of some of its powers the city is not liable.

The Court of Appeals has said:

"The power to pass health ordinances like these is derived from what is known as the police power of the state, and it was delegated to be exercised, not for the benefit, or in the interest of, the city in its corporate capacity, but for the public good. Commissioners and other officials acting under such ordinances and enforcing such regulations perform duties and occupy positions similar, in legal effect, to that of police officers, and it is well settled that such officers appointed by a city are not its agents or servants, so as to render it responsible for their unlawful or negligent acts in the discharge of their duties." Boehm & Loeber v. Mayor & City Council of Baltimore, 61 Md. 265.

The city certainly cannot in every case be held responsible to individuals for injuries they may suffer by its failure to use all the powers which it has. For example, an Iowa city was sued by one who said that the agents of the city had called on him to assist in moving a coffin in which was the corpse of one who had died from smallpox. He was not told that the case was a smallpox case. He communicated the disease to his two children, and they died from it. He sought to hold the city liable. The court said:

"The consequences of the doctrine contended for would be startling and alarming. The sections of the laws referred to by him authorize a city, in the same language that the powers are conferred, which were exercised in this case, to maintain a police organization, fire companies, and employ a physician for the poor. The principle which would hold the defendant liable for the negligent acts here complained of would compel a city to respond in damages for the neglect of its police to suppress a riot, the failure of its firemen to arrest a conflagration, and the negligence of its physician in prescribing for a patient. * * * The true doctrine in that the powers conferred in the sections we have been considering are of a legislative and governmental nature for a defective execution of which the city cannot be held liable." Ogg v. City of Lansing, 35 Iowa, 498, 14 Am. Rep. 499.

I do not feel that a court of admiralty would be justified in extending the principle laid down by the Court of Appeals of Maryland in Marriott's Case, supra, to nuisances other than those which affect the city's streets and highways in spite of the somewhat broad language in which the highest court of Maryland has stated the principle under which it holds that the city is responsible for permitting nuisances in its streets.

The libelants say that they do not ask any extension even in the application of the doctrine of Marriott's Case. They say that navigable water is a public highway, and that if the city is responsible for not exercising powers given to it for the purpose of keeping its highways free of nuisances it is responsible for not exercising the power it has to keep the waters of this lagoon free of nuisance. The authorities, however, are to the effect that navigable water within the corporate limits of the city or over which the city is given control is not a highway in the same sense as is a city street. As has been said, "the obligation to keep streets and highways in a safe condition for public use cannot be invoked against" a municipality, "for, while the river is a highway for the passage of vessels, that portion of it which happens to be embraced within the boundaries of a city is not one of its ways so as to burden it with the duty of removing obstructions and keeping it safe for navigation." Coonley v. City of Albany, 132 N. Y. 149, 30 N. E. 382.

The law of Ohio required the city to cause all public highways to be kept open and in repair and free from nuisance. The libelant's vessel struck on a snag or other submerged obstruction in the harbor of Cleveland. The Circuit Court of Appeals for the Sixth Circuit, speaking through the mouth of then judge, now Mr. Justice Lurton, said that, while a harbor is in one sense a highway, it is not a highway in the sense that its streets, alleys, and roads are, and that it knew of no principle of maritime law by which a municipality is responsible for the navigable character of the waterways within its limits. Faust v. City of Cleveland, 121 Fed. 810, 58 C. C. A. 194. See, also, Goodrich et al. v. City of Chicago, 20 Ill. 447.

The only case which I can find in which a municipality has been held liable for not removing an obstruction in navigable waters is that of Winpenny v. Philadelphia, 65 Pa. 137.

The law made it the duty of the city councils to keep the navigable waters within the city of Philadelphia forever open and free from obstruction. The court there said that were it not for the mandatory language of the statute there would be no such liability.

I am therefore of opinion that the city is not liable in this case.

There is, if anything, still less ground for imposing liability upon the county commissioners of Baltimore county. They are sued because, as the local governing body of Baltimore county, they are under obligations to keep its roads, bridges, and highways free and unobstructed.

I shall proceed to state my conclusions as to the amount which the libelants should recover against Andrew and Kunigunda Miller.

Frank S. Pryor was 19 years of age. He received $4.50 a week as a machinist apprentice. He paid $3.50 of it to his father. His father

furnished him with board, lodging, and clothing. He did work around the house of a pecuniary value. If he had lived ten months longer he would have completed his time as an apprentice and would have become a journeyman. He would then have received $2.25 a day for the first six months, $2.50 a day for the second six months, and after that not less than $2.75 a day.

The law of Maryland limits the amount which parents can recover for the death of their minor child to such pecuniary benefit as they can reasonably expect from him before he attains the age of 21 years. Agricultural Ass'n v. State, 71 Md. 86, 18 Atl. 37, 17 Am. St. Rep. 507.

In this case I shall allow them $700.

I shall allow James G. Pryor $100 for injury to his launch.

Mrs. Mary A. Houck was 55 years of age. Although her head was for the most part kept above the water, it was some time before she was taken out of it. The fright and exposure made her seriously, and for some hours critically, ill. She was confined to her bed for nearly four weeks after the accident. She had been a strong, hearty woman, who did all the family work, including the washing. It is admitted that before the accident she was somewhat hard of hearing. She and her family say that immediately after it she grew very deaf and still remains so. They say that her eyesight before August 5, 1909 was good; that since then it has become bad. They claim that, whereas, she was formerly a normal person of agreeable manners and disposition, she has since become exceedingly irritable. They assert that she is unwilling to talk on any subject except religion and the accident. There is some claim that she no longer can do the household work to which she had been accustomed. I saw her on the stand and heard her testimony and that of the witness who deposed as to her condition. I believe that the accident was a great shock to her. I have no doubt that it aged her, accomplishing in a few minutes what would otherwise in the course of nature have taken some years to bring about. I make an allowance of $1,000 to her and $500 to her husband, Joseph C. Houck.

Mrs. Katherine E. Brown was a woman 48 years of age with a husband aged 56 and four children, ranging in age from 12 to 18. She did all her family work, except the laundry. The family kept no servant; a woman being brought in weekly to do the washing. She had some assistance in the spring and fall housecleaning. Since her death the house is being cared for by a daughter, Eleanor M., a girl of 15. I think the husband in this case should have $3,000 and the daughter Eleanor $500. I do not find that the other children have suffered any pecuniary loss.

There remains the case of Willard T. Leach, a bright, healthy boy of 10 years of age. Here I am limited by the reasonable expectation of the pecuniary benefit which his parents would receive from him before he arrived at the age of 21 years. It is almost impossible, of course, to make any estimate of what this sum would be. After the best thought that I can give to the question, I have decided to allow $1,500.